S06A1791. HORNE v. THE STATE.
(642 SE2d 659)

THOMPSON, Justice.
Following a jury trial, Derek Horne was convicted of malice murder and various other crimes arising from an armed robbery at a

---

Church's Fried Chicken store, and the fatal shooting of one of its employees.[1] We agree with Horne's contention on appeal that the trial court erred in allowing the prosecution, in the presence of the jury, to propound a lengthy series of leading questions to Horne's co-indictee who refused to testify under a grant of immunity, but we conclude that, under the circumstances, the error is harmless. The remaining enumerations of error are without merit.

Viewed in a light most favorable to the verdict, the evidence established that Sean Abraham and Ammon Crawford, two managers of the Church's store, were preparing to close the store at about 5:30 a.m. on the day in question. As they set the burglar alarm and exited the building, they were forced back inside by Horne and co-indictee, Charles Hill, both of whom were carrying guns, wearing bandanas over their faces, and hoods over their heads.[2] Horne and Hill held the employees at gunpoint and demanded money from them. At that point, the burglar alarm sounded and all the men fled into the street. Crawford was able to get into his vehicle and drive away from the scene. Abraham attempted to escape on foot, but Horne gave chase.

Moments later, Abraham ran up to a woman seated in a parked vehicle and frantically shouted, "He's trying to kill me. Can you please help?" The woman then saw a tall, slender man round a corner and approach her car with a gun in his hand.[3] He was wearing what appeared to be an army fatigue jacket with a hooded top pulled around his face, revealing his eyes. She positively identified Horne in court as the assailant. The witness saw Horne hold the gun to Abraham's head and order him away from the vehicle and into the street. As she drove away to summon help, she observed through her

---

[1] The crimes were committed on February 7, 2004. On May 12, 2004, Horne was charged in a twenty-count indictment with malice murder; felony murder while in the commission of an aggravated assault, and while in the commission of an armed robbery; possession of a firearm during the commission of a crime (seven counts); aggravated assault (four counts); burglary; kidnapping with bodily injury; kidnapping; armed robbery; possession of a controlled substance; and theft by receiving stolen property. A jury trial commenced on May 23, 2005, and on May 26, 2005, Horne was found guilty as charged. He was sentenced on June 7, 2005 to consecutive life terms for murder, kidnapping with bodily injury, and armed robbery. In addition, he received concurrent terms for aggravated assault, burglary, kidnapping, possession of a controlled substance, and theft by receiving, and consecutive terms for the weapons possession offenses; the remaining convictions were merged. A motion for new trial was filed on June 16, 2005, amended on December 16, 2005, and denied on April 6, 2006. A notice of appeal was filed on April 20, 2006. The case was docketed in this Court on June 28, 2006, and oral argument was heard on October 3, 2006.

[2] A severance of defendants was granted and Horne was tried first. Hill was convicted in a separate trial; his conviction was affirmed on appeal to this Court. *Hill v. State*, 281 Ga. 795 (642 SE2d 64) (2007).

[3] It was established that Horne was about 6 feet 4 inches in height.

rear view mirror that Horne had forced Abraham onto his knees and she heard Abraham pleading for his life; a gunshot followed.

At the same time, another eyewitness in a parked vehicle heard angry conversation, and then observed a tall, dark complected, African-American man holding a gun to the head of the victim. She described the assailant as wearing a hooded garment pulled tightly around his face revealing only his eyes, nose and lips.

Horne killed Abraham with a single gunshot to the head. The only item of value in Abraham's possession was a Nokia cellular phone, which Horne appropriated.

Anthony Grant, a close friend of co-indictee Hill, was awakened later that morning by Horne and Hill at his door. Both co-defendants appeared agitated and nervous and Grant perceived that they had been in some trouble. Later Grant learned of the armed robbery/murder and he contacted the police.

Another Church's employee was familiar with Horne and Hill because they lived in the same neighborhood and attended high school together. This employee testified that Horne and Hill were regular customers at the Church's store and were usually "trouble," and that they visited the store on the two days prior to the armed robbery.

While serving a search warrant at Horne's residence, police seized an army fatigue jacket, a hooded sweatshirt, bandanas consistent with those worn during the crimes, a plastic bag containing cocaine, as well as items which had been taken in an armed robbery of Tony's Market one month earlier. Telephone records established that calls were made between Abraham's cellular phone and Horne's mother's home subsequent to the shooting.

1. Horne asserts that the trial court erred in denying his motion for a directed verdict of acquittal, claiming that the evidence was wholly circumstantial and did not eliminate every reasonable hypothesis other than his guilt. See OCGA § 24-4-6.

While the evidence was in part circumstantial,

> [q]uestions as to the reasonableness of hypotheses are generally to be decided by the jury which heard the evidence and where the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, that finding will not be disturbed unless the verdict of guilty is insupportable as a matter of law.

(Citation and punctuation omitted.) *Smith v. State*, 280 Ga. 161, 162 (1) (625 SE2d 766) (2006).

In addition to circumstantial evidence, there was direct evidence of Horne's guilt from an eyewitness in the parked vehicle who positively identified him as the perpetrator based upon her observations when he approached her vehicle. Although Crawford could not make a positive identification because Horne was wearing a mask in the Church's store, his description of Horne's height and build was generally similar to that of the other eyewitnesses. Following the crimes, cellular phone calls were made from Abraham's phone to Horne's mother and police seized clothing from Horne's residence that was consistent with clothing worn by the perpetrators.

We hold that the evidence was sufficient to enable a rational trier of fact to find Horne guilty beyond a reasonable doubt of the crimes for which he was convicted. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Horne asserts that he was denied effective assistance of trial counsel because: (a) counsel did not move to sever the theft by receiving and drug charges (both resulting from evidence seized during the search of Horne's residence) from the remaining charges on the basis that they were unrelated to the Church's murder/robbery; (b) although counsel filed a notice of alibi, he failed to offer any alibi evidence; and (c) counsel failed to file a motion to suppress evidence seized from Horne's home.

> To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficiency so prejudiced defendant that there is a reasonable likelihood that, but for counsel's errors, the outcome of the trial would have been different. *Strickland v. Washington,* 466 U. S. 668 (104 SC 2052, 80 LE2d 674) (1984); *Smith v. Francis,* 253 Ga. 782 (1) (325 SE2d 362) (1985). The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. [Cit.] The trial court's findings with respect to effective assistance of counsel will be affirmed unless clearly erroneous. [Cit.]

*Domingues v. State,* 277 Ga. 373, 374 (2) (589 SE2d 102) (2003).

At the hearing on the motion for new trial, trial counsel testified that he made the election not to seek severance of the charges in the hope that the jury would opt to convict on the drug and theft offenses and refuse to convict on the more serious charges. The potential alibi witness was Horne's mother; however, trial counsel was concerned that she was subject to impeachment with a prior inconsistent statement which could harm the defense; and Horne ultimately

instructed counsel not to call his mother to testify. Both were reasonable tactical decisions that any competent attorney would make under similar circumstances. See *Walker v. State*, 281 Ga. 521, 525 (7) (640 SE2d 274) (2007).

Counsel considered filing motions to challenge the search but then decided they would be frivolous. Horne has not carried his burden of showing "that the damaging evidence would have been suppressed had counsel made the motion." *Parker v. State*, 281 Ga. 490, 493 (640 SE2d 44) (2007). Accordingly, Horne has not established that he was denied constitutionally effective assistance of trial counsel for any of the reasons asserted. *Strickland*, supra.

3. Horne claims that the trial court erred in admitting evidence of his gang affiliation because he was not charged with a gang-related offense or criminal gang activity.

The evidence in question consisted of writings which were taken from Horne's jail cell during a routine search, as well as papers seized during execution of the search warrant at Horne's residence. These consisted of numerous handwritten pages, some of which referenced robbery and killing using a nine millimeter weapon and receiving proceeds of the crimes. After a pretrial hearing, the court determined that the writings were relevant and admissible to show intent and that any prejudicial effect of the evidence was outweighed by its probative value.[4] The court, however, refused the State's request to allow an expert witness to identify the material as gang-related. In addition, the court admonished the prosecutor to refrain from any reference to gang activity, and none was presented to the jury.

We agree that the evidence was properly admitted as relevant to the use of the weapon and the manner of shooting and to show Horne's intent and state of mind. Any connection to gang activity was at best collateral and could only result from speculation on the part of the jury. See *Ramirez v. State*, 279 Ga. 569 (9) (619 SE2d 668) (2005). Furthermore, there is no requirement that the State charge a defendant with a gang-related offense "in order to admit otherwise relevant evidence of gang activity." *Wolfe v. State*, 273 Ga. 670, 674 (4) (c) (544 SE2d 148) (2001). Accordingly, we find no abuse of discretion in admitting the writings into evidence. Id.

4. Horne submits that the trial court erred in allowing the State to offer evidence of an independent act for the purpose of showing course of conduct and bent of mind.

In accordance with Uniform Superior Court Rule ("USCR") 31.3, the State gave pretrial notice of its intent to offer evidence that Horne

---

[4] After the court determined that certain parts of the documents were relevant and admissible, defense counsel asked that all the writings be offered into evidence.

had committed an armed robbery of a convenience store one month prior to the robbery of the Church's store. In a pretrial proffer, the State tendered a surveillance videotape that pictured a tall, masked man enter Tony's Market at 9:34 a.m., hold a gun to the head of the proprietor, and leave with cash and personal property of the proprietor, including a wallet, credit cards, and Indian currency. The same personal items were seized during the search of Horne's home, and that evidence formed the basis for the charge of theft by receiving stolen property.

The trial court ruled that the State satisfied its burden of showing by a preponderance of the evidence that the independent act was admissible under *Williams v. State*, 261 Ga. 640 (2) (409 SE2d 649) (1991), and also that the evidence was admissible as proof of the present crime of theft by receiving stolen property. We agree that the independent act evidence satisfied the evidentiary requirements of *Williams*, and that evidence of the armed robbery of Tony's Market was admissible as proof of the charged crime of theft by receiving. See also USCR 31.3 (E) (notwithstanding USCR 31.3, State may introduce evidence of other transactions which are "immediately related in time and place to the charge being tried, as part of a single, continuous transaction"); *Beasley v. State*, 269 Ga. 620 (4) (502 SE2d 235) (1998). Accordingly, we find no abuse of the trial court's discretion in admitting the evidence. See *Grimes v. State*, 280 Ga. 363 (6) (628 SE2d 580) (2006).

5. On appeal, Horne asserts that the Confrontation Clause of the Sixth Amendment was violated when the prosecutor was permitted to ask a series of leading questions which suggested the guilt of the accused to co-indictee Charles Hill who was granted immunity but refused to testify at Horne's trial.[5]

In a pretrial custodial statement, Hill admitted that he and Horne participated in the armed robbery of the Church's store, and he identified Horne as the shooter. Horne denied any involvement in the crimes when questioned by the police. As a result, the two defendants were to be tried separately, and Hill was granted use and derivative use immunity under OCGA § 24-9-28 (a) for the purpose of testifying at Horne's trial.

When Hill was called as a witness for the State, Horne's counsel objected to the witness being questioned in the presence of the jury because counsel believed that Hill would refuse to answer any

---

[5] Although Horne asserts on appeal that the State's questioning of Hill also violated *Bruton v. United States*, 391 U. S. 123 (88 SC 1620, 20 LE2d 476) (1968), and constituted inadmissible hearsay, these grounds were not raised below and, therefore, will not be considered in our analysis. See *Haynes v. State*, 269 Ga. 181 (2) (496 SE2d 721) (1998) (*Bruton* claim); *Roseberry v. State*, 274 Ga. 301 (3) (553 SE2d 589) (2001) (hearsay claim).

questions put to him. The jury was excused and Horne's attorney elaborated on his objection:

It's my understanding [Hill's] statement that he gave to the police wouldn't be admissible and we'll get to that later. But that's also prejudicial to [Horne] because we're not able to cross-examine him at all. I think the court has to be very careful with this, because I think [Hill] is going to come out here and I think he's going to take the Fifth Amendment, even though he has no right to do, but I don't think that matters.

When asked how Hill's refusal to testify would prejudice Horne, defense counsel responded, "they're indicted together. And [Hill's] refusal to testify would prejudice [Horne] simply through his silence." Although the court acknowledged that during the earlier immunity proceedings Hill had expressed his reluctance to testify at Horne's trial, the court nonetheless declined defense counsel's request to question the witness out of the presence of the jury.

The jury was returned to the courtroom, Hill was sworn, and the prosecutor began by asking him to state his name. Hill remained silent. The court admonished him that he was not entitled to invoke the Fifth Amendment privilege against self-incrimination because he had been granted immunity, and that each refusal to answer a question put to him subjected him to a separate count of criminal contempt. See OCGA § 24-9-28 (b); *Willard v. State*, 244 Ga. App. 469, 470 (1) (a) (535 SE2d 820) (2000) (grant of immunity pursuant to OCGA § 24-9-28 (a) removes any right to invoke the privilege against self-incrimination). The prosecutor resumed the questioning but Hill remained mute. Twice more during questioning the court admonished Hill that he was subjecting himself to numerous counts of contempt, but Hill still refused to respond.

Although the initial questions to Hill were fairly innocuous, the prosecutor then began to ask a series of leading questions which laid out in significant detail the State's case against Horne. For example, leading questions were posed to Hill concerning the content of admissions he made to two individuals — his friend, Grant,[6] and his

---

[6] Q: Early in morning of February 7, 2004, after all this happened at the Church's Chicken and in the alley behind Bay, you went to Mr. Grant's house, didn't you?
Q: You and [Horne], our defendant right here, went to Mr. Grant's house, didn't you?
Q: You told him that something happened that you might be in trouble about, didn't you?
Q: The following Friday you saw Anthony Grant, didn't you?
Q: You told him what the trouble was about, didn't you?
Q: You told Mr. Grant that two people had been inside the store, didn't you?

cousin, Jonathan Hamilton[7] — describing the robbery at the Church's store and identifying Horne as the shooter. The prosecutor concluded with a series of leading questions going to the content of Hill's custodial statement in which he described how he and Horne committed the robbery at the Church's store and how Horne chased down and killed Abraham.[8] In all, 117 questions were posed to Hill and Hill never uttered a word in response.

---

Q: Sir, you told Mr. Grant that you all robbed the store as the employees were coming out the door.

. . .

Q: And you also told Anthony Grant about the shooting, didn't you?

Q: You talked about running down Bay Street after him, didn't you?

Q: And you told Mr. Grant that [Horne] actually caught the man, didn't you?

Q: And you said that [Horne] asked you if he should "murk" him. What does "murk" mean?

Q: Did you understand that to mean that he was asking if he should kill that man, Mrs. Abraham's son?

Q: That's what he was asking you, isn't it?

Q: And do you remember what you told Mr. Grant? You told him no.

Q: And do you remember telling Mr. Grant that [Horne] shot the man anyway?

Q: And do you remember telling Mr. Grant that you all didn't get any money? Do you remember that?

[7] Q: What about Jonathan Hamilton? You know him, don't you?

Q: You call him J. R., don't you? . . .

Q: He's your cousin. . . .

Q: And you told J. R. what you had done with [Horne], didn't you? . . .

Q: And you told J. R. that one dude ran and the other one stayed, didn't you?

Q: And you told J. R. that [Horne] chased the one who ran, didn't you?

Q: And you told J. R. that [Horne] – it was [Horne] that actually caught the man, didn't you?

Q: And you told J. R. also that [Horne] asked if you should kill the man, didn't you?

Q: And you told J. R. also that you told [Horne] no, and you told J. R. that [Horne] shot the man, anyway. Didn't you tell him that?

[8] Q: Do you recall being taken to a room at the police department? . . .

Q: And do you remember talking to a black police officer and a white police officer?

Q: Actually, you do remember, because . . . you have seen a videotape, haven't you?

Q: You told the police that you all had on masks, didn't you?

Q: You told the police that the idea was to wait until the people came out of the store, that you all pushed the employees back into the store. You told the police that, didn't you?

Q: And you said that [Horne] demanded money.

Q: You told the police that one man ran.

Q: You told the police that [Horne] took off running. You said you followed, didn't you?

Q: And you told the police that the man was pleading not to kill him.

Q: And you told the police that [Horne] asked you, "Should I do it?" and you told him not to do it. That's what you told the police, anyway.

Q: And you told the police that [Horne] shot the man, and [Horne] got the man's cell phone. . . .

Q: You remember riding with the detectives after they spoke with you . . . [and] pointing out to them [Horne]'s house.

Q: And do you remember showing the detectives specifically where you and [Horne] ran after Sean Abraham was shot?

The defense chose not to cross-examine Hill but asked the court to give a limiting instruction. The court refused, but did instruct the jury in the final jury charge that "[e]vidence does not include . . . questions asked by the attorneys." Although the jury was not instructed concerning any inference it may or may not draw from Hill's refusal to testify, in closing argument the prosecutor urged the jury to draw an adverse inference by asking: "What else do we have? We have our co-defendant. . . . He doesn't answer a single dadgum question. . . . [T]his co-defendant . . . knows what the defendant is capable of doing better than anybody because he saw it. That's why he didn't testify."[9]

This Court has found an abridgement of the right of confrontation under the Sixth Amendment where the State, in the jury's presence, posed a series of leading questions suggesting the guilt of the accused to a co-indictee witness who refused to answer on Fifth Amendment grounds. *Lingerfelt v. State*, 235 Ga. 139 (218 SE2d 752) (1975) ("*Lingerfelt II*"). See also *Lingerfelt v. State*, 231 Ga. 354 (3) (201 SE2d 445) (1973) ("*Lingerfelt I*"). In *Lawrence v. State*, 257 Ga. 423 (3) (360 SE2d 716) (1987), the Court reached the same result with regard to an unindicted witness who invoked the Fifth Amendment privilege, reasoning that the procedure "whereby the prosecutor was allowed, in effect, to testify for the witness and circumvent meaningful cross-examination as to obvious inferences, is clearly unacceptable and was harmful to the defendant." Id. at 425, n. 3.

In *Greenwood v. State*, 203 Ga. App. 901 (1) (418 SE2d 160) (1992), our Court of Appeals applied the rationale of *Lingerfelt II* and *Lawrence* in circumstances almost identical to this appeal. There, the court found the defendant was entitled to a mistrial because the State posed leading questions in the presence of the jury to a co-indictee who had been granted immunity but nevertheless refused to testify. In analogizing the Fifth Amendment cases to the witness who refuses to answer under a grant of immunity, the court observed:

> Since the witness' clearly stated refusal to testify was not altered by the grant of immunity, the trial court's order, or the adjudication of contempt, we fail to discern any manner in which the grant of immunity can be said to have altered the circumstances in the case sub judice from those in *Lingerfelt [II]* and *Lawrence*. The knowledge of the trial court and prosecuting counsel that the witness would not answer the questions posed remained the same, as were the

---

[9] Horne did not object to this argument.

consequences of allowing the prosecuting attorney to call the witness and ask leading questions based on the witness' prior statement.

*Greenwood,* supra at 902 (1).

In the present case, Horne's counsel brought his objection to the attention of the trial court and sought unsuccessfully to question Hill out of the jury's presence to determine whether the witness would respond. The court did not excuse the jury, nor did it take any other corrective action when it became apparent that the witness intended to remain mute. Although the questions posed to Hill and Hill's refusal to answer were not evidence, "the undeniable effect of this prosecutorial procedure was to place before the jury, through the questions asked, the content of [the witness'] statement to the police, and the clear inference [of the defendant's guilt]." *Lawrence* at 425. Here, the questioning bore on a fundamental part of the State's case, the jury was given no contemporaneous limiting instructions from the court, and Hill "could not be cross-examined on a statement imputed to but not admitted by him." *Douglas v. Alabama,* 380 U. S. 415, 419 (85 SC 1074, 13 LE2d 934) (1965).[10] "[E]ffective confrontation of [Hill] was possible only if [he] affirmed the statement[s] as his," id., 380 U. S. at 420, which he did not do. Assuming that Horne's objection was sufficient to invoke the protections of the Confrontation Clause of the Sixth Amendment, we hold under the circumstances that Horne's inability to cross-examine Hill deprived Horne of that right. Id.

Our analysis does not end here, however, because even error of a constitutional magnitude, such as an abridgment of the Sixth Amendment right of confrontation, can be deemed harmless. "[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California,* 386 U. S. 18, 24 (87 SC 824, 17 LE2d 705) (1967). The burden rests with the prosecution in making this showing. See *State v. Hightower,* 236 Ga. 58, 61 (222 SE2d 333) (1976) (State must show beyond a reasonable doubt that the error did not contribute to the verdict). "The fact that there was other sufficient evidence to convict does not make the error harmless; rather, the test

---

[10] In *Douglas v. Alabama,* supra, the Court held that the confrontation clause was violated when a co-indictee witness refused to answer a series of leading questions posed by the prosecution which recited in detail the circumstances of the charged crime. Although the witness in *Douglas* attempted to invoke his Fifth Amendment privilege, the trial court determined that the privilege was not available to him because he had previously been convicted of the charges in a separate trial.

is whether the evidence may have influenced the jury's verdict." *Jones v. State*, 265 Ga. 84, 86 (4) (453 SE2d 716) (1995).

The evidence against Horne was both direct and circumstantial. An eyewitness identified him as the man who approached her car with a gun in hand, ordering Abraham into the street just prior to the shooting. The witness' identification was uncontroverted and she did not waver in her identification even when subjected to extensive cross-examination. Her physical identification of Horne and the description of his clothing were consistent with the testimony of two other eyewitnesses who observed Horne as he was committing the crimes, and consistent with the clothing seized from Horne's residence. Horne and Hill frequented the Church's store where the armed robbery occurred and it could be inferred that they were casing it in the days prior to the crimes. Horne and Hill appeared at a friend's home in an agitated and nervous state in the hours following the shooting, and it was established that Abraham's stolen cellular phone was used to call Horne's mother's home subsequent to the shooting. While the prosecutor's questioning of Hill was clearly impermissible, it was not evidence and it added nothing of material value that had not otherwise been properly presented to the jury. Under the circumstances, we hold that the State carried its burden of showing beyond a reasonable doubt that the error did not contribute to the verdict.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 19, 2007.

*Daly, Bowen & Calhoun, Brian L. Daly*, for appellant.
*Spencer Lawton, Jr., District Attorney, Ann M. Elmore, Assistant District Attorney, Thurbert E. Baker, Attorney General, Edwina A. Watkins, Assistant Attorney General*, for appellee.