## A10A1528. SILVERIO v. THE STATE.
(702 SE2d 717)

MIKELL, Judge.

In 2004, a twenty-four count indictment was returned against Mario Alberto Silverio and eight others[1] in the Superior Court of Gwinnett County charging them with various offenses arising out of a string of home invasions. Silverio was tried separately in 2008. The jury convicted Silverio on 22 counts, including burglary (Counts 1, 5, 7, 9, 12, 15, and 22), armed robbery (Counts 2, 6, 8, 10, 13, and 16), aggravated sexual battery (Counts 3 and 4), misdemeanor sexual battery (Count 14), aggravated assault (Counts 11, 17 and 24), attempted burglary (Count 18), and attempted armed robbery (Counts 19 and 23). The trial court sentenced him to an aggregate of six consecutive life terms plus 271 years, to run consecutively. Silverio appeals from the order denying his motion for new trial, arguing that the trial court committed various evidentiary errors and improperly denied his motion to suppress. We discern no error warranting reversal and thus affirm his convictions.

1. Although Silverio does not challenge the sufficiency of the evidence to support his convictions, we recount the evidence below.

Construed in a light most favorable to the verdict,[2] the evidence shows that Silverio founded a gang known as Puros Locos, or "PL-14," which committed eight home invasions in Gwinnett County from February through April 2004. The gang preyed on

[1] Gonzalo Ortega, Jose Martinez, Hugo Hernandez Delfino, Paulino Gonzalez Martinez, Gustavo Cisneros, Jaime Carrera-Camargo, Cecilio Castro-Delacruz, and Javier Alonso Quiroz.
[2] *Hillman v. State*, 296 Ga. App. 310-311 (674 SE2d 370) (2009).

families with children. The first victims of the crime spree resided at Oakland Walk Court in Lawrenceville. Kenia Munguia, who lived with her three small children, her mother, Reyna Puerto, and her six-year-old sister, K. M., testified that she was awakened by a loud boom during the early morning hours on February 25, 2004. Suddenly, five armed, masked men dressed in black broke down her bedroom door and demanded money, the keys to her minivan, and jewelry. They spoke Spanish.

The men surrounded Munguia's bed. One of them pointed a gun at her head and threatened to kill her unless she gave him more money. The gunman then sexually assaulted Munguia by placing his entire fist inside her vagina. Other masked gunmen entered Puerto's room as well and demanded money and jewelry from her. One of the assailants struck Puerto in the head, put her in the closet, and ordered her to take off her clothes. The assailant then put his gloved fingers inside her vagina. Puerto's little girl, K. M., who was watching, testified that she begged the men to stop hurting her mother and even gave them her gold bracelets to try to make them stop. They took her bracelets but continued hitting Puerto with a gun. Before leaving, the gunmen bound and gagged Munguia, Puerto and K. M., and they took a minivan as well as money and jewelry.

The next home invasion took place on March 5, 2004, at River Landing Drive in Lawrenceville. Johanna Farez, who was pregnant, and her husband were awakened in their bedroom in the middle of the night by five or six armed men who shone flashlights on them. The gunmen claimed to be sheriff's officers. Farez testified that the men were dressed in black, wore hooded masks, and spoke Spanish and English. The assailants demanded money and jewelry from Farez and her husband and tied them up with shoelaces.

Gunmen next broke into Isidoro Vasquez, Sr.'s home on Glenwhite Drive in Duluth on March 29, 2004, while Vasquez was with his wife at the hospital, where she gave birth. Two of Vasquez's children, and his brother and nephews, were at home. Juan Luis Carranza, Vasquez's nephew, testified that around 3:30 a.m., several masked gunmen, who spoke Spanish, entered the residence and demanded money. The assailants took money out of Carranza's jacket and tied him up. One of them terrorized Vasquez's eleven-year-old son by pointing a gun at his head and threatening to shoot him. The gunmen put the child in his parents' room, tore up the bed, and found $4,000 hidden under the mattress. The gunmen stole the money as well as a pickup truck that was parked outside.

Next, on April 9, 2004, Victorino Saturnino, who shared a house with five roommates on Sandune Drive in Norcross, testified that he had fallen asleep on the couch and was awakened by a gun placed against his temple. The assailant spoke Spanish and wore a mask; he

took $2,000 out of Saturnino's pocket. Other gunmen went upstairs, robbed other roommates, and tied them up. Saturnino testified that he and another roommate were taken to the kitchen, where they were made to lie face down on the floor next to each other. Saturnino heard one of the two gunmen say, "well, which of the two?" They shot him in the leg with a silenced weapon. The assailants eventually took clothing, wallets, money, and a truck.

The crime spree continued on April 18, 2004, at the Friendly Village Mobile Home Park in Lawrenceville. Masked gunmen broke into a home where Antonia Palacios lived with her husband, Enrique Robles, and her two adolescent children. The family was robbed at gunpoint, and Robles was tied up and beaten. The assailants pointed guns at the children and tied them up with shoelaces. One of the assailants tied up Palacios while another touched her breasts and pulled her panties down. The gunmen took money, jewelry, a PlayStation, a computer and a vehicle.

While gunmen waited with Robles and the children, four assailants, who were still wearing masks, made Palacios get into a car and ordered her to lead them to a mobile home occupied by her sister and brother-in-law, Paula Perez and Gildardo Pineda, and their son, K. P. After forcing their way inside, the assailants put a gun to Pineda's head, threw everyone on the floor, and tied them up. Then one assailant used a knife that he heated on the stove to burn Pineda's back multiple times to force him to disclose where his money was hidden. The gunmen also threatened to cut off K. P.'s fingers. Pineda then disclosed the location of the money. The assailants ran off with that money, as well as Perez's ring, identification card, and phone.

After this ordeal, Pineda and his family moved to his brother's house. The gang found them. Pineda testified that on April 27, 2004, he heard persons trying to break the door down in the middle of the night. This time, Pineda had a gun, and he shot twice into the air when he heard the banging on the door. Pineda saw these persons take off running.

The final home invasion occurred on April 30, 2004, at a residence at Davenport Park Lane in Lawrenceville. Joel Michael Frater testified that his wife was out of town and he was home with his 14-year-old daughter when he was suddenly awakened in the middle of the night by a man holding a gun. The man wore a ski mask and dark clothing. When Frater tried to snatch the gun away, the assailant shot him repeatedly, striking Frater in the hand, face, and chest. After the gunman emptied his clip, he fled.

On that same night, Gwinnett County police officers responded to a call of a suspicious vehicle with a loud muffler driving around a neighborhood less than a mile away from Frater's house. Officers stopped the vehicle, a Honda Accord, which was driven by Jaime

Carrera-Camargo. After learning that Carrera-Camargo had no driver's license, officers arrested him and searched his vehicle. Police found a loaded "Uzi-type" weapon, additional ammunition, multiple black gloves, a pistol, and coins in the car.

Once in custody, Carrera-Camargo admitted his involvement in the home invasions and provided information leading the authorities to develop several persons, including Silverio, as suspects. Based on the information, the police were able to identify two locations, in the Willow Trail and Clairmont Springs apartment complexes, where the suspects might be found, and they set up surveillance. The surveillance led to an arrest warrant for Silverio, and he was arrested without incident at 1316 Willow Trail Parkway. Sergeant Edward Restrepo testified that Silverio was cooperative and gave his consent to search the residence. Restrepo went into Silverio's bedroom and opened a dresser drawer, where he found a ski mask. At that point, the search was stopped and a search warrant was secured.

While executing the search of Silverio's apartment, officers located black pants, shirts, and black leather jackets, ski masks, a large amount of jewelry, stereo equipment, and "tons of stuff . . . bagged up in duffel bags." The police also found a ball cap embroidered with "PL-14" on the front and "King" on the back. Silverio's gang nickname was "King." Munguia, Puerto, and Farez identified jewelry found in Silverio's apartment as items stolen during the robberies of their respective homes. A search warrant also was obtained for the Clairmont Springs apartment, and a search yielded guns, knives, a plethora of ammunition, scopes, silencers, more jewelry, black gloves, ski masks, a PlayStation, and a computer.

Restrepo testified that eight suspects, including Silverio, were taken into custody following Carrera-Camargo's arrest. One suspect, co-indictee Gonzalo Ortega, who leased the Clairmont Springs apartment, gave a statement implicating Silverio in the home invasions and explaining in detail how they were executed. Ortega also stated that he feared Silverio because he threatened to kill his family in Mexico. Another co-indictee, Jose Martinez, testified that Silverio selected the homes to rob, provided the guns, and arranged for places to meet after committing the robberies to divide the proceeds. Martinez testified, outside the presence of the jury, that during the trial, Silverio threatened him and Carrera-Camargo not to talk or their families would pay. Carrera-Camargo took the stand but refused to answer questions about Silverio. Ortega also testified. He claimed that the "lookout" during the robberies was actually a different Mario Silverio than the person on trial, and that the one on trial was never involved in the crimes. Subsequently, Martinez testified before the jury that Silverio had threatened that "if we talked about him that our families were going to pay."

The evidence recounted above supports Silverio's conviction on all 22 counts beyond a reasonable doubt.[3]

2. In his first enumeration of error, Silverio argues that the trial court erred in refusing to admit under OCGA § 24-3-10,[4] the prior testimony exception to the hearsay rule, statements made by another co-indictee, Cecilio Castro-Delacruz, during his plea hearing. We disagree.

The transcript of the plea hearing shows that Castro-Delacruz testified, in response to the prosecutor's questions, that Silverio was not present at certain robberies. Castro-Delacruz also stated, however, that Silverio, Martinez, and Cisneros provided to Castro-Delacruz the locations to rob and that Silverio received jewelry and money from the various robberies. After the prosecutor questioned Castro-Delacruz, the trial court found that a factual basis existed for the plea and that it was entered freely and voluntarily. The trial court ordered, as a condition of Castro-Delacruz's probation, that he testify truthfully against his co-defendants if summoned as a witness at any trial.

Silverio then called Castro-Delacruz as a defense witness. After being sworn, however, Castro-Delacruz refused to answer any questions, even after the trial court ordered him to testify and threatened to hold him in contempt. Castro-Delacruz did identify a copy of his final disposition, which was admitted into evidence.

Silverio moved to introduce the plea transcript into evidence, arguing that it was necessary, exculpatory, and admissible under OCGA § 24-3-10. The trial court disagreed, ruling, in essence, that the transcript was inadmissible under either OCGA § 24-3-10 or the necessity exception to the hearsay rule. The court found that Castro-Delacruz was not unavailable and that the statements lacked sufficient indicia of reliability. Silverio argues that the trial court's exclusion of the evidence on these grounds was error. Silverio contends that prior testimony is deemed inherently reliable if it satisfies OCGA § 24-3-10. That is correct,[5] but Castro-Delacruz's testimony at his plea hearing does not satisfy the statute.

Our Supreme Court has ruled that a trial court may admit the testimony of a witness given at a prior proceeding "provided the

---

[3] See *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] OCGA § 24-3-10 states:

The testimony of a witness since deceased, disqualified, or inaccessible for any cause which was given under oath on a former trial upon substantially the same issue and between substantially the same parties may be proved by anyone who heard it and who professes to remember the substance of the entire testimony as to the particular matter about which he testifies.

[5] *Walton v. State*, 272 Ga. 73, 74 (3) (526 SE2d 333) (2000).

proponent is able to show that: (1) the declarant is unavailable as a witness at trial; (2) the testimony was given under oath at a hearing or other proceeding; and (3) the parties and issues are substantially similar."[6] The purpose of the last requirement, that the two proceedings involve substantially the same issues and parties, is to ensure that the party against whom the testimony is now being offered had an adequate opportunity for cross-examination at the prior proceeding.[7] "Admissibility, in fact, hinges on the adequacy of an opportunity for cross-examination, rather than on the type of proceeding in which the prior testimony was presented."[8]

In the case at bar, Silverio satisfied the first two conditions. Castro-Delacruz's refusal to testify at Silverio's trial rendered him unavailable within the meaning of OCGA § 24-3-10,[9] and his testimony at the guilty plea hearing was given under oath. The state argues that the trial court correctly excluded the plea transcript because the prosecutor did not have an adequate opportunity to cross-examine Castro-Delacruz at the guilty plea hearing, considering the nature and purpose of a plea colloquy and the fact that he was the state's witness. In this regard, our Supreme Court held in *Barnes v. State*[10] that "where the issues and parties are *identical*, and the party against whom the testimony is offered called the witness to the stand at the previous hearing or trial, the need for cross-examination is basically satisfied, and the requirement is met."[11] In *Barnes*, the defendant had called a witness to testify on direct at a committal hearing after the state had rested, and the state briefly cross-examined the witness. At trial, the witness was deemed inaccessible, and the state was permitted to introduce the witness's prior testimony. In affirming, the Court noted that

> [a] party with the confidence to call a witness for direct examination could hardly complain, later, about a denial of an opportunity for cross-examination. The *Prater* rule is primarily designed for cases in which the unavailability of a

[6] (Citation omitted.) *Martin v. State*, 284 Ga. 504, 505 (1) (668 SE2d 685) (2008).

[7] Id. at 506 (1), citing *Craft v. State*, 154 Ga. App. 682, 683 (1) (269 SE2d 490) (1980); *Prater v. State*, 148 Ga. App. 831, 837 (5) (A) (2) (253 SE2d 223) (1979). Accord *Pope v. Fields*, 273 Ga. 6, 7-8 (1) (a) (536 SE2d 740) (2000).

[8] (Citation omitted.) *Martin*, supra.

[9] *Kilgore v. State*, 291 Ga. App. 892, 896-897 (1) (663 SE2d 302) (2008) (witness deemed unavailable when she refused to answer counsel's questions on cross-examination); *Hardeman v. State*, 277 Ga. App. 180, 183-184 (2) (a) (626 SE2d 138) (2006) (witness was deemed unavailable when he pled the Fifth Amendment at trial).

[10] 256 Ga. 370 (349 SE2d 387) (1986).

[11] (Footnote omitted; emphasis in original.) Id. at 371-372 (2) (b).

third party might foreclose a defendant or prosecutor's opportunity to cross-examine a witness.[12]

Applying these guidelines, we conclude that Silverio, as the proponent of the testimony, failed to establish a substantial similarity of issues between his trial and Castro-Delacruz's plea hearing such as would ensure that the state had an opportunity for meaningful cross-examination at the plea hearing.[13] "The purpose of a plea colloquy is to protect the defendant from an unintelligent or involuntary plea."[14] To that end, the state questioned Castro-Delacruz at his plea hearing to establish the factual basis for his plea and to show that he was entering it freely and voluntarily. As the purpose of the hearing was to protect Castro-Delacruz, it cannot be said that the state was afforded an opportunity for meaningful cross-examination. We thus conclude that the trial court did not abuse its discretion in excluding Castro-Delacruz's plea transcript.[15]

Moreover, any possible error in the trial court's exclusion of the transcript was harmless. Castro-Delacruz's statements at the plea hearing regarding Silverio's involvement in the crimes were contradictory at best and thus would not have impacted the verdict. Furthermore, Ortega had already testified during the state's case that Silverio was not involved in any of the crimes. Accordingly, the excluded evidence would have been cumulative of trial testimony that had already been admitted, so that error, if any, in its exclusion was harmless.[16]

3. In his second enumeration of error, Silverio argues that the trial court should have granted his motion to suppress evidence seized from his apartment because his consent to search was not given freely and voluntarily. As the trial court found otherwise based on disputed evidence, we disagree.

At a hearing on a motion to suppress, the trial judge sits as the trier of fact. And Georgia law has long held that the trier of fact may believe or disbelieve all or any part of the testimony of any witness. Thus, on appellate review of a trial court's order on a motion to suppress evidence, we never second-guess the trial court's factual findings where

---

[12] Id. at 372 (2) (b), n. 2, citing *Prater*, supra at 836 (5) (a).

[13] Compare *Walton*, supra (witness's prior testimony was given under oath and subject to a thorough cross-examination by the defendant in previous trial).

[14] *Mitchell v. United States*, 526 U. S. 314, 322 (II) (A) (119 SC 1307, 143 LE2d 424) (1999). Accord *Fuller v. State*, 244 Ga. App. 618, 619 (1) (536 SE2d 296) (2000).

[15] See *Green v. State*, 207 Ga. App. 800, 801 (429 SE2d 169) (1993).

[16] See *Dixon v. State*, 256 Ga. 658, 660-661 (2) (352 SE2d 572) (1987).

they are based on testimonial evidence. We construe the evidence most favorably to the upholding of the trial court's findings and judgment and affirm unless the court has committed an error of law.[17]

Moreover, "we consider all the evidence of record, including evidence introduced at trial."[18]

In the case at bar, the evidence adduced on this issue shows that after obtaining a warrant for Silverio's arrest for armed robbery, Restrepo and several other officers proceeded to his apartment at 1316 Willow Trail Parkway. Restrepo testified that he knocked on the door and that Silverio answered it. Restrepo asked Silverio whether he was, in fact, Mario Silverio. Silverio replied affirmatively and offered "no resistance whatsoever." Women and young children were present. Restrepo handcuffed Silverio and requested his consent to search the residence. According to Restrepo, Silverio was cooperative and gave his consent to search. Restrepo went into Silverio's bedroom and opened a dresser drawer, where he found a ski mask. At that point, the search was stopped and a search warrant was secured. Restrepo informed the other occupants of the apartment that their movements within the premises would be restricted pending the execution of a search warrant. Restrepo's conversation with Silverio was conducted entirely in Spanish.

Detective Keith Wiggins, who obtained the arrest warrant and prepared the affidavit for the search warrant, testified that Restrepo had informed him that Silverio had given verbal consent to search the apartment and that Restrepo had found items of clothing, including knit hats and shoes, that matched the description given by suspects that were already in custody.

Silverio testified at the suppression hearing. According to Silverio, when he opened the door, he saw four officers pointing guns at him; the officers told him to put his hands on his head and then put him on the ground; and while two officers handcuffed him, the other two officers went to his bedroom. Silverio denied that any officer asked for his consent to search. Silverio's sister, Romelio Silverio, testified that she was with her brother when the police arrived; that they grabbed him, threw him on the floor, pointed a gun at him, and handcuffed him; and that the Spanish-speaking officer never asked Silverio for his consent to search. Based on this testimony, Silverio argues that his consent was coerced.

---

[17] (Punctuation and footnotes omitted.) *State v. Rowell*, 299 Ga. App. 238-239 (682 SE2d 343) (2009).

[18] (Footnote omitted.) *Whitehead v. State*, 258 Ga. App. 271, 273 (1) (574 SE2d 351) (2002).

When the state relies on a consent search, it bears the burden of showing "that the consent was voluntarily given, and not the result of duress or coercion, [either] express or implied."[19] Voluntariness is a question of fact to be determined by the trial court from all of the circumstances.[20] The circumstances present here support the trial court's finding, implicit in its order denying the motion to suppress, that Silverio voluntarily consented to the search of his bedroom. At the outset, we note that any contradiction between the officers' testimony and that of Silverio and his sister presented a credibility issue for the trial court to resolve.[21] The evidence supports a finding that Restrepo requested and received Silverio's consent to search under permissible circumstances. The presence of several police officers does not require a finding of coercion, although it merits close judicial scrutiny.[22] Here, Restrepo testified that his gun was not drawn and that Silverio was compliant. Moreover, while Silverio was handcuffed at the time he consented to the search, this Court has held that voluntary consent may be given while a suspect is handcuffed.[23] We conclude that the state satisfied its burden of showing that Silverio's consent was not the product of coercion, express or implied.

Finally, we reject Silverio's argument that he merely acquiesced to a claim of lawful authority in allowing the search, as his assertion is not supported by the evidence.[24] Rather, he and his sister testified that the officers never asked for his consent to search the premises. Having denied that officers requested his consent, Silverio cannot now claim that he permitted a search. Furthermore, "[t]here was no showing that the officers misrepresented their authority to enter and search against [Silverio's] will, if necessary."[25] For these reasons, the trial court did not err in denying his motion to suppress.

4. Silverio next argues that the trial court erred in denying his motion to suppress two statements he made in response to question-

---

[19] (Citations and punctuation omitted.) *Code v. State*, 234 Ga. 90, 93 (III) (214 SE2d 873) (1975). Accórd *Gray v. State*, 296 Ga. App. 878, 882 (5) (b) (676 SE2d 36) (2009).

[20] *Code*, supra; *Maloy v. State*, 293 Ga. App. 648, 650-651 (2) (667 SE2d 688) (2008).

[21] See *Buckholts v. State*, 247 Ga. App. 697, 699-700 (2) (545 SE2d 99) (2001); *Gray*, supra at 883 (5) (b).

[22] *Code*, supra at 94 (III).

[23] *Maloy*, supra at 651 (2); *Green v. State of Ga.*, 250 Ga. App. 440, 442 (2) (550 SE2d 736) (2001).

[24] See *Brooks v. State*, 285 Ga. 424, 426 (677 SE2d 68) (2009).

[25] (Citations omitted.) Id. Compare *State v. Davis*, 261 Ga. 225, 226 (404 SE2d 100) (1991) (defendant's mother gave police a house key only because they threatened forcible entry otherwise); *State v. Jones*, 269 Ga. App. 325, 327 (604 SE2d 228) (2004) (police threatened search notwithstanding defendant's refusal to give consent); *Johnson v. State*, 297 Ga. App. 847, 848-849 (678 SE2d 539) (2009) (arresting officer exceeded permissible scope of pat-down search for weapons when he ordered defendant to withdraw an identity card from his pocket).

ing at the time of his arrest regarding whether he lived at the apartment and where his bedroom was located therein. He contends that the questioning constituted "custodial interrogation" requiring the administration of *Miranda*[26] warnings, which had not yet been given, because the officer should have known that his questions were likely to elicit an incriminating response. We disagree.

The record shows that upon entering Silverio's apartment, Restrepo asked whether he lived there, and Silverio replied affirmatively. Restrepo testified at the suppression hearing that he asked Silverio that question in order to determine whether he could give consent to search. "Asking questions normally attendant to arrest and custody is not a 'custodial interrogation' which requires the administration of *Miranda* warnings."[27] Inquiring as to a suspect's address is a question commonly associated with arrest and custody and provides no basis for suppression of the response.[28] Silverio also complains that Restrepo asked which bedroom belonged to him. Restrepo's testimony as to whether or not he made this inquiry is contradictory, however, and the trial court resolves all conflicts in the evidence. In this regard, the trial court may believe or disbelieve all or any part of the testimony of any witness.[29] "As a general rule, the trial court's decision on questions of fact and credibility at a suppression hearing must be accepted unless clearly erroneous."[30] Silverio has not demonstrated that the denial of his motion to suppress these alleged statements is clearly erroneous. Accordingly, this enumerated error fails.

5. Silverio next complains that the trial court violated his right of confrontation by denying his motion for mistrial made after the prosecutor asked Carrera-Camargo on direct examination whether he had been threatened by Silverio. Whether to grant a mistrial is within the sound discretion of the trial court, whose ruling will not be disturbed on appeal absent an abuse of that discretion.[31] Silverio has not shown that the trial court abused its discretion herein.

The record on this issue shows that initially, Carrera-Camargo answered the state's questions regarding his involvement in the home invasions, his guilty plea, and his sentence of 50 years to serve 25. When the prosecutor began to ask questions about co-indictees,

---

[26] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

[27] *Metts v. State*, 270 Ga. 481, 484 (3) (511 SE2d 508) (1999), citing *Mincey v. State*, 257 Ga. 500, 506 (10) (360 SE2d 578) (1987) (no *Miranda* violation where defendant was asked his street address during booking).

[28] *Mincey*, supra.

[29] *Handy v. State*, 298 Ga. App. 633, 634 (680 SE2d 646) (2009).

[30] (Citation and punctuation omitted.) *Sampson v. State*, 209 Ga. App. 213, 216 (2) (433 SE2d 136) (1993). Accord *Merritt v. State*, 288 Ga. App. 89, 96 (2) (653 SE2d 368) (2007).

[31] See *Ladson v. State*, 248 Ga. 470, 478 (12) (285 SE2d 508) (1981).

however, Carrera-Camargo refused to answer any further questions, stating finally, "I am not going to testify either way, and not in favor of either side." The state then asked Carrera-Camargo whether Silverio had ever threatened him; whether he ever told anyone that Silverio had threatened him; and whether Silverio had ever threatened him specifically about testifying. Silverio objected to the questions as prejudicial, nonprobative, and inflammatory. The trial court overruled the objection. After the defense rested, Silverio moved for a mistrial, arguing that his right to confront Carrera-Camargo had been violated. The trial court denied the motion but instructed the jury, pursuant to Silverio's request, that the evidence "does not include . . . the questions asked by the lawyers." The court declined to instruct the jury that no inferences could be drawn from the witness's failure to testify, and Silverio excepted to the court's failure to so charge the jury.

On appeal, Silverio likens his case to that of *Horne v. State*,[32] in which the defendant's co-indictee, who had given a pretrial statement detailing his and the defendant's involvement in an armed robbery and identifying the defendant as the shooter, refused to utter any response to 117 questions posed by the state that fully laid out the contents of his statement for the jury.[33] Our Supreme Court held that the defendant's inability to cross-examine his co-indictee deprived him of his right of confrontation under the Sixth Amendment.[34] The Court also ruled, however, that the error was harmless because the prosecutor's questions of Hill were not evidence and "added nothing of material value that had not otherwise been properly presented to the jury."[35]

Contrary to Silverio's argument, *Horne* is distinguishable from the case at bar because the procedure permitted by the trial court did not place the content of Carrera-Camargo's statement before the jury.[36] Rather, the questions derived from Martinez's statement to the trial court that during the trial, Silverio had threatened him and Carrera-Camargo not to talk or their families would pay. Finally, even if the three questions posed by the prosecutor could be

---

[32] 281 Ga. 799 (642 SE2d 659) (2007).

[33] Id. at 806-807 (5).

[34] Id. at 808 (5).

[35] Id. at 809 (5).

[36] Compare *Lawrence v. State*, 257 Ga. 423, 425 (3) (360 SE2d 716) (1987); *Lingerfelt v. State*, 235 Ga. 139, 140 (218 SE2d 752) (1975); *Deloatch v. State*, 296 Ga. App. 65, 69 (1) (673 SE2d 576) (2009). Cf. *Collins v. State*, 242 Ga. App. 450, 451-452 (1) (529 SE2d 412) (2000) ("[u]nless [a] statement is otherwise directly admissible against the defendant, the Confrontation Clause is violated by the admission of a nontestifying co-defendant's statement which inculpates the defendant by referring to the defendant's name or existence, regardless of the existence of limiting instructions").

construed as violating Silverio's right of confrontation, any such violation was rendered harmless by properly admitted evidence that Silverio had threatened to kill both Martinez's and Ortega's families if they talked about him.[37] Accordingly, this enumeration of error fails.

6. Silverio next contends that the trial court erred in permitting the state to introduce evidence of prior bad acts and similar transaction evidence without giving advance notice and a hearing.[38] This enumeration of error fails because no similar transaction evidence was introduced at trial. The evidence which Silverio improperly categorizes as prior bad acts and similar transactions was properly admitted during co-indictee Ortega's testimony. Specifically, the state questioned Ortega concerning Silverio's involvement in the crimes charged in the indictment, and when Ortega testified that a different Mario Silverio participated in the crimes, the state impeached Ortega with his prior testimony given during the trial of co-indictee Cisneros and with his pretrial statement to detectives.[39] That any of the testimony about which Silverio complains may have incidentally placed his character in issue does not render it inadmissible.[40]

7. Finally, Silverio contends that the state violated OCGA § 17-16-7 by not disclosing, ten days before trial, Martinez's statement that Silverio threatened him. This argument fails as well, because the record shows that the statement was not known by the state until trial, when Martinez and Carrera-Camargo were placed in the same holding cell.

*Judgment affirmed. Smith, P. J., and Adams, J., concur.*

DECIDED OCTOBER 13, 2010.

*Norman H. Cuadra*, for appellant.
*Daniel J. Porter, District Attorney, Lisa A. Jones, Tracie H. Cason, Assistant District Attorneys*, for appellee.

---

[37] *Horne*, supra.

[38] See *Gardner v. State*, 273 Ga. 809, 810-811 (2) (546 SE2d 490) (2001) (setting out requirements for admission of similar transaction evidence).

[39] See, e.g., *Duckworth v. State*, 268 Ga. 566, 567-568 (1) (492 SE2d 201) (1997) (setting out procedure for impeaching a witness with a prior inconsistent statement).

[40] See *Johnson v. State*, 260 Ga. 457, 458 (2) (396 SE2d 888) (1990) ("Evidence which is relevant to an issue in a case is not rendered inadmissible by the fact that it incidentally puts the defendant's character in issue") (citation omitted).