In the Supreme Court of Georgia

Decided: June 2, 2014

S14A0396. HICKS v. THE STATE.

THOMPSON, Chief Justice.

Appellant Latilia Hicks, Leo Sanders, Darrian Pye, and Lorenzo Chambers were jointly indicted for felony murder and numerous other crimes relating to the shooting death of Maynon Freeman.[1] Sanders pled guilty to voluntary manslaughter and testified against the remaining defendants, who were tried together. Appellant and Pye were found guilty on all counts, and Chambers was found not guilty on all counts.[2] In her appeal, appellant contends, among other

---

[1] In a pre-trial appeal, we addressed whether the trial court erred in suppressing oral and written statements made to the police by Pye and Chambers. We affirmed in part and reversed in part in Pye's case and affirmed in Chambers's case. See State v. Pye, 282 Ga. 796 (653 SE2d 450) (2007).

[2] The crimes occurred on June 27, 2005. On December 27, 2005, appellant was indicted by a Fulton County grand jury for (1) felony murder based on conspiracy to commit armed robbery, conspiracy to commit hijacking a motor vehicle, armed robbery, hijacking a motor vehicle, and aggravated assault with a deadly weapon; (2) aggravated assault with a deadly weapon; (3) armed robbery; (4) hijacking a motor vehicle; (5) possession of a firearm during the commission of a felony; (6) conspiracy to commit armed robbery; and (7) conspiracy to commit hijacking a motor vehicle. Appellant's jury trial began on March 17, 2008, and on March 26, the jury found appellant guilty on all counts. That same day, the trial court sentenced appellant to life with the possibility of parole for felony murder, to 20 concurrent years in prison for hijacking a motor vehicle, and to five consecutive years in prison for the firearm offense. The court merged the remaining verdicts for sentencing purposes. Appellant filed a timely motion for new trial, which she amended on January 24, 2012. That same day, the trial court held a hearing on the motion. Appellant filed a premature notice of appeal on February 16, 2012, and premature amended notices of appeal on June 6 and 11,

things, that the evidence is insufficient to support her convictions and that her trial counsel provided ineffective assistance. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the verdict, the evidence shows that about 4:00 a.m. on June 27, 2005, the victim was shot once in the back of the head with an AK-47 rifle shortly after he drove his family's blue Ford Expedition into the driveway of his family's home at 3790 Clearwater Drive in College Park, Georgia. A few days before, on June 23, 2005, Pye called the Fulton County Police Department and told an officer that the rims to his car had been stolen; that some friends of his had seen a blue Ford Expedition with what looked like his rims on it; and that his friends followed the Expedition to a house at 3760 Clearwater Drive in College Park, Georgia. That address, however, was several houses away from the Freemans' residence. The next day, a police officer drove by that address and did not see a blue Ford Expedition there, and the lead was not pursued thereafter.

On June 26, 2005, appellant, who lived in Florida, came to Atlanta to visit

2012. The trial court denied the motion for new trial, as amended, on September 26, 2013. The case was docketed in this Court for the January 2014 term and submitted for decision on the briefs.

Sanders, with whom she had been in a long distance relationship for several weeks. About 11:00 p.m. that night, she and Sanders met Pye and Chambers in the parking lot of a skating rink. Sanders was friends with Pye but had not previously met Chambers. The victim and his brother, Dominique Freeman, were also at the skating rink, having driven there with two women in the family's blue Ford Expedition. Sanders testified that while he was talking with Pye and Chambers at Pye's car, Pye pointed out the blue Ford Expedition, claimed that the vehicle's rims had recently been stolen from him, and said that he planned to recover the rims. Sanders saw an AK-47 rifle in the back seat of Pye's car. According to Sanders, appellant was not with him at that time but was instead standing by her car.

Appellant then approached the SUV by herself and began talking to Dominique Freeman, who gave her his cell phone number, and the two agreed to meet at the 20 Grand nightclub later that night. Appellant rejoined Sanders, Pye, and Chambers, and they drove in Pye's and appellant's cars to a hotel in College Park where appellant and Sanders were staying. There, the AK-47 was moved from Pye's car to the trunk of appellant's car. Sanders testified that he did not know how the AK-47 got into appellant's car, but he admitted that he

told a police officer before trial that Pye told him to open the trunk when they were at the hotel. The four then drove appellant's car to the 20 Grand nightclub. The Freeman brothers were there. Appellant approached them and then left with them and the two women who were with them in the blue Expedition. They drove to the Freeman residence, and during the ride, appellant told Dominique that they should have sex at a hotel. Pye, Chambers, and Sanders also left the nightclub, drove down the street on which the Freemans lived, and then to a nearby gas station. About 2:00 a.m., appellant left the Freeman residence with the brothers and the two women. The two women were dropped off at a game room, and appellant and the Freeman brothers drove to a hotel in Union City. Sanders, Pye and Chambers followed the brothers' SUV in appellant's car. Appellant and Dominique entered the hotel, while Maynon drove off in the SUV. Cell phone records presented at trial revealed that appellant was in communication with Sanders throughout this time.

After Maynon left the hotel, Sanders, Pye and Chambers followed him to a Waffle House near Maynon's home. Maynon stopped to get food, but the three men did not. Instead, they drove to the victim's neighborhood and parked two houses away from his house. Sanders testified that, "from the beginning,

it [was] supposed to be a confrontation," but that he did not think Maynon would be shot. The men exited their car and walked to the Freeman residence to wait for Maynon to arrive. When he did and was confronted by the men, he ran. One of the men fired a shot from the AK-47, striking Maynon in the back of the head and causing his death, and then placed the AK-47 in the trunk of appellant's car. Several neighbors of the Freemans heard the shot, which they said occurred shortly after 4:00 a.m. Pye took Maynon's keys and drove the SUV to a middle school, while Sanders and Chambers drove appellant's car back to the Union City hotel.

Back at the hotel, appellant initiated intimate contact with Dominique, but then stopped it to talk on the phone. After speaking on the phone a number of times, appellant told Dominique that she was going to get ice. Instead, however, appellant met Sanders and Chambers in the parking lot and left the hotel with them. Sanders called Pye about 5:00 a.m. to find out where Pye had gone, and the group from the hotel then drove to the middle school. A few minutes later, a City of Atlanta police officer who was responding to an unrelated silent alarm going off at the school drove into the school parking lot. Sanders told appellant to drive away while he stayed with the SUV, and Pye and Chambers fled the

5

scene on foot. Appellant then picked up Pye and Chambers and dropped them off with the gun at another location. Meanwhile, the officer, who testified that it looked like someone was attempting to take "some wheels" off the Ford Expedition, questioned Sanders, who gave the officer his younger brother's name. After dropping off Pye and Chambers, appellant returned to the school, where she was also questioned by the officer. Finding no outstanding warrants on Sanders or appellant and no stolen vehicle reports for either vehicle, the officer eventually let them leave in appellant's car and towed the SUV. The officer's investigation lasted about an hour, and cell phone records show that Sanders called Pye at 6:27 a.m. After being released by the officer, Sanders and appellant checked out of their hotel room in College Park and left for Florida.

The police officer who spoke with Pye on June 23 about his stolen rims also responded to the crime scene at the Freeman home on June 27. He remembered Pye's call and the Clearwater Drive address that Pye had provided and told the investigating homicide officer about it. On September 29, 2005, Pye was arrested; Chambers was arrested on October 3; and Sanders and appellant were arrested in Florida in October and November 2005, respectively.

At trial, Sanders denied that appellant, whom Sanders referred in a pre-

6

trial statement as his "future wife," knew of or participated in the plan to recover Pye's rims. However, Sanders admitted that he told the police shortly after his arrest that "she was involved, knew what was going on, had been told to get in the [Expedition], and report back to [him] on the [its] location." On another occasion, Sanders admitted that he had told police that Pye told appellant "to get in the Expedition."

Appellant contends that the evidence is insufficient to support her convictions. She correctly says that all of the crimes with which she was charged – aggravated assault with a deadly weapon, armed robbery, hijacking a motor vehicle, the conspiracy to commit armed robbery and hijacking a motor vehicle, and felony murder predicated on those offenses – require the use of a firearm. See, e.g., OCGA § 16-5-21 (a) (2) (aggravated assault with a deadly weapon); OCGA § 16-8-41 (a) (armed robbery); OCGA § 16-5-44.1 (b) (hijacking a motor vehicle). Appellant argues that the State had to prove that she participated in the crimes with knowledge that one of her co-conspirators had an AK-47 and that the State failed to offer sufficient proof of that element.

Contrary to appellant's contention, there is some evidence by which the jury could infer that appellant knew of the rifle. Sanders's prior inconsistent

7

statements were that appellant had knowledge of "what was going on [and] had been told to get in the [Expedition] and report back to [Sanders] on [its] location." Further, appellant did get in the Expedition; she told Dominique that she wanted to have sex with him even though she was dating Sanders, thereby isolating the victim and making it easier for her confederates to take back the rims; the rifle was moved from Pye's car to the trunk of her car at the hotel in which she was staying; and she helped Pye and Chambers escape with the rifle after the police officer arrived at the middle school. We need not decide whether this and other evidence is sufficient to prove beyond a reasonable doubt that she knew of the rifle, because appellant is wrong that she had to have knowledge of the weapon to be convicted of the charged crimes.

> [A] criminal conspiracy is a partnership in crime, and . . . there is in each conspiracy a joint or mutual agency for the prosecution of a common plan. Thus, if two or more persons enter into a conspiracy, any act done by any of them pursuant to the agreement is, in contemplation of law, the act of each of them and they are jointly responsible therefor. This means that everything said, written, or done by any of the conspirators in execution or furtherance of the common purpose is deemed to have been said, done, or written by each of them. . . . And this joint responsibility extends not only to what is done by any of the conspirators pursuant to the original agreement but also to *collateral acts* incident to and growing out of the original purpose[, so long as] . . . they are a *natural* and *probable* consequence of the conspiracy.

8

Everritt v. State, 277 Ga. 457, 459 (588 SE2d 691) (2003) (citations omitted;

emphasis in original). And a collateral crime is a natural and probable

consequence of the original purpose of the conspiracy if that crime is a

reasonably foreseeable consequence of the original conspiracy. See id. Thus,

we have held that:

> Where two or more persons conspire to rob another who is employed in a building, and one of the conspirators keeps watch or guard at a convenient distance while the others enter the building and, in furtherance of the common design to rob, kill the person intended to be robbed, such killing is a probable consequence of the unlawful design to rob, and all the conspirators are guilty of murder, including the one on guard. It is not necessary that the crime of murder should be a part of the original design; but it is enough if it be one of the incidental probable consequences of the execution of their design, and should appear at the moment to one of the participants to be expedient for the common purpose. The intent of the actual slayer is imputable to his coconspirators.

Burke v. State, 234 Ga. 512, 513 (216 SE2d 812) (1975) (citations and internal

punctuation omitted), overruled on other grounds by Hutchins v. State, 284 Ga.

395, 396-397 (667 SE2d 589) (2008). Relying on these principles, this Court

has rejected the argument that a co-conspirator to a robbery must know that his

fellow conspirator has a gun before he can be found guilty of felony murder

based on armed robbery. See Williams v. State, 276 Ga. 384, 386 (578 SE2d

9

858) (2003) (holding that the defendant's knowledge of whether his co-conspirator had a gun "was not a necessary component of his guilt for armed robbery and, consequently, for felony murder" and that "[a]ll that the State was required to prove was that Appellant was a member of a conspiracy to rob the store and that [his co-conspirator's] use of the weapon was naturally or necessarily done in furtherance of that crime").[3]

Here, the trial court charged the jury on these principles,[4] including

_____

[3]The United States Supreme Court recently held that, under the federal aiding and abetting statute, see 18 USC § 2, a person may be convicted of aiding and abetting the federal crime of using or carrying a firearm in connection with a drug trafficking crime, see 18 USC § 924 (c), only if he had advance knowledge that a co-defendant would use or carry a firearm. See Rosemond v. United States, ___ U.S. ___, ___ (134 S Ct 1240, 1248-1250, 188 LE2d 248, 261-263) (2014). That case arose under federal law and thus does not control here. Further, the Supreme Court explicitly said that, because "no one contends that a § 924 (c) violation is a natural and probable consequence of simple drug trafficking[,] [w]e . . . express no view on the issue." Id. at 1248 n.7. At least one federal court has said that Rosemond's advance knowledge requirement to convict someone for aiding and abetting a § 924 (c) violation does not apply when the government seeks to convict under the alternate theory that a conspirator can be liable for his co-conspirator's reasonably foreseeable use of a firearm during a drug trafficking crime. See United States v. Young, ___ Fed. Appx. ___, ___, 2014 U.S. App. LEXIS 6322, 15-17 (2d Cir. N.Y. Apr. 4, 2014).

[4] The trial court charged, among other things, that:

Before a person may be held responsible for any act done in furtherance of a conspiracy that was not part of the original agreement; that is, any act that is incident to and grew out of the original purpose of the agreement, you must find that the act

10

reasonable foreseeability, and viewing the evidence in the light most favorable to the verdict, we conclude that it was sufficient to authorize a rational jury to find beyond a reasonable doubt that appellant conspired to rob the Freeman brothers and that murder was a reasonably foreseeable consequence of the conspiracy. The jury was authorized to find that Pye's conspirators knew that he was upset by the loss of his rims and that the purpose of separating the two brothers was so that Pye, Sanders, and Chambers could confront one brother by himself to obtain the rims. The jury was also authorized to find that the conspirators must have been aware of the prospect that, wherever the victim stopped after he left appellant and Dominique at the hotel, it would not be in a place hidden from view; that to obtain the rims, the conspirators would steal the Ford Expedition, as they would not run the risk, even late at night, of removing four wheels from the SUV in a place where they could be easily discovered; of the prospect that the victim would not willingly hand over the keys to the family's car; of the prospect that another member of the conspiracy would take a weapon to the confrontation; and of the prospect that deadly force would be

---

was a natural and probable consequence of the conspiracy. That is, the incidental act must have been reasonably foreseeable to the defendants.

11

used to obtain the car.

The evidence was thus sufficient to authorize the jury to find appellant guilty beyond a reasonable doubt of the crimes of which she was convicted and sentenced. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); OCGA § 16-2-20 (parties to a crime); Williams, 276 Ga. at 386.

2. During jury deliberations, the jury sent the court a note, saying that it had "reached a unanimous verdict on all but three counts, 3, 4, and 6 for one defendant,"[5] and asking the court two questions:

> (1) Would a defendant have to be aware of a weapons [sic] presence before a crime is committed to convict the defendant of possession of a firearm?
> (2) During the commission of a felony when does a felony begin and when does a felony end?

After some discussion, in which the State and appellant told the trial court that it should not answer the second question and the State objected to answering the first question, the trial court stated that it would not answer either one. Appellant's trial counsel then said, "I think you have to leave [both

---

[5]If the dissent is correct that the jury was referring to appellant in this statement, see dissent at 3, that means that the jury had reached a unanimous verdict of guilty against appellant on felony murder and hijacking a motor vehicle.

questions] alone." The trial court then told the parties, "I think that's the best thing to do."

Appellant now contends that the trial court erred in not charging the jury in response to the first question.[6] However, because appellant expressly told the trial court that it should not answer the question, appellant

> invited the alleged error, and it therefore provides no basis for reversal. See Barnes v. State, 269 Ga. 345, 356 (496 SE2d 674) (1998). See also Cheddersingh v. State, 290 Ga. 680, 682-684 (724 SE2d 366) (2012) (explaining that affirmative waiver, as opposed to mere forfeiture by failing to object, prevents a finding of "plain error" under OCGA § 17-8-58 (b)).

Shank v. State, 290 Ga. 844, 845-846 (725 SE2d 246) (2012). Accord Lake v. State, 293 Ga. 56, 57 (743 SE2d 414) (2013) (holding that, because the defendant told the trial court that it should not recharge the jury in response to its request, the defendant had "waived review of this issue on appeal"); United States v. Fulford, 267 F3d 1241, 1247 (11th Cir. 2001) (holding that a defendant's explicit agreement with a proposed jury instruction constituted

---

[6]Although the jury specifically limited the question to the firearm possession offense, Count 6, the dissent appears to assume that the jury was directing the question to the aggravated assault and armed robbery counts, Counts 3 and 4. For purposes of this opinion, we assume the jury was asking about all counts.

invited error). Moreover, even applying plain error review, reversal is not warranted. Because the trial court adequately instructed the jury regarding appellant's liability as a conspirator for other crimes committed by her partners in crime, we cannot conclude that the trial court's error, if any, in declining to answer the jury's question "likely affected the outcome of the proceedings" and "seriously affected the fairness, integrity, or public reputation" of the trial. Inman v. State, 294 Ga. 650, 655 (__ SE2d __) (2014).

3. Appellant contends that she received ineffective assistance of trial counsel. To prevail on this claim, appellant must show that her counsel performed deficiently and that, but for the deficiency, there is a reasonable probability that the outcome of the trial would have been more favorable to her. See Strickland v. Washington, 466 U.S. 668, 687, 694 (104 SCt 2052, 80 LE2d 674) (1984). "This burden, although not impossible to carry, is a heavy one." Young v. State, 292 Ga. 443, 445 (738 SE2d 575) (2013), and appellant has not carried it here.

(a) Appellant claims that trial counsel was ineffective in failing to adequately stress the defense that she could not be convicted of any of the crimes with which she was charged unless the State proved that she knew that

her fellow conspirators possessed a weapon.  This ineffectiveness claim has no foundation, because, as explained above, appellant could be convicted of the crimes in question even if she did not know about the weapon.  Thus, this claim is without merit.

(b)  At trial, appellant pursued the defense that she did not conspire with Pye, Chambers, and Sanders to commit any crime.  The dissent now asserts that trial counsel was ineffective in pursuing this defense and in not pursuing a different one – that appellant conspired to commit the crime of theft by taking, which, according to the dissent, could not be a basis for her convictions.  Although appellant asserted other claims of ineffective assistance of trial counsel in her motion for new trial, this specific claim was not asserted in that motion, and at the hearing on the motion, appellant did not mention any claim of ineffective assistance of trial counsel.  Thus, the claim is not properly before us.  See Benson v. State, 294 Ga. 618, 622 (754 SE2d 23) (2014); Jones v. State, 294 Ga.  501, 503 (755 SE2d 131) (2014).

Moreover, even if the claim were properly before us, it lacks merit.  "'Judicial scrutiny of counsel's performance must be highly deferential.'" Wells v. State, __ Ga. __, __ (__ SE2d __) 2014 Ga. LEXIS 348, *7 (Case No.

S14A0491, decided May 5, 2014) (citation omitted). For this reason, "the law recognizes a 'strong presumption' that counsel performed reasonably, and the defendant bears the burden of overcoming this presumption." Id. (citation omitted). "'In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.'" Id. (citation omitted). Moreover, there are

> "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach.

Harrington v. Richter, 562 U.S. __, __ (131 SCt 770, 788-789, 178 LE2d 624, 643) (2011) (citation omitted). And, as we have explained, when, as here, "'trial counsel does not testify at the motion for new trial hearing about [a] subject, it is extremely difficult to overcome' the presumption that his conduct was reasonable." Shaw v. State, 292 Ga. 871 (742 SE2d 707) (2013) (citation omitted).[7]

---

[7]Appellant's trial counsel died before the hearing on her motion for new trial, but that "does not relieve the petitioner of his 'heavy burden' of proving ineffective assistance." Schofield v. Meders, 280 Ga. 865, 867 n.2 (632 SE2d

16

Here, trial counsel's defense was that appellant did not have any motive to enter into a conspiracy to take the rims, since she did not know Pye and Chambers and did not have any interest in obtaining Pye's rims; that Sanders, whom the evidence showed had a prior criminal record and had lied to the police in this case, was not a credible witness and had put appellant in a position to be an unfortunate victim of circumstance on the night of the crimes; that Dominique Freeman and appellant had seen each other at the skating rink before the night of the crimes, thus explaining why they spoke to each other and got together on the night of the crimes; and that, if appellant was guilty of the conspiracy that the State alleged, she would not have driven back to the middle school, knowing that the police officer was there speaking with Sanders about the Ford Expedition and knowing that the officer would, as he did, ask for her identification and run the tags on her car.  In light of these circumstances, we cannot conclude that trial counsel's strategy was "so patently unreasonable that no competent attorney would have followed such a course."  Wells v. State, __ Ga. at __, 2014 Ga. LEXIS 348, *7.

This is particularly true, given that the theory proposed by the dissent –

369) (2006) (citation omitted).

17

that appellant actually conspired with Pye, Chambers, and Sanders to commit a theft by taking once the victim parked the car and entered his house – would have required the jury to believe that, although Pye, Chambers, and Sanders discussed with appellant a detailed plan of having appellant seek to have sex with Dominique at a hotel to attempt to get rid of the other two women in the car, of then hoping that the victim would return home, of then waiting until he entered the house to take the wheels off the car, and of then returning to the hotel to pick up appellant, they did not share that the plan "from the beginning," as Sanders testified, was to confront the victim or that the three men had a gun. And, such a defense also would have required trial counsel to convince the jury that the conspirators would have agreed to a plan that would have forced them to remove four wheels from the Ford Expedition in the Freemans' driveway, a public place where they might be discovered even early in the morning. The theft-by-taking plan also would have been hard to reconcile with the fact that the conspirators had no way to know if the victim would in fact return home after leaving appellant and Dominique at a hotel.

For these reasons, trial counsel did not perform deficiently in pursuing the chosen defense strategy, and this claim of ineffective assistance of counsel lacks

18

merit.

4. Appellant contends that the trial court erred by refusing to sever her trial from those of the other defendants. Even assuming appellant preserved this issue for appeal,[8] it is without merit.

> In a murder case where the death penalty is not sought, the trial court has broad discretion to grant or deny a motion for severance. In ruling on a severance motion, the court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses.

Billings v. State, 293 Ga. 99, 105 (745 SE2d 583) (2013) (citation omitted).

Here, because there were only three defendants and the law and evidence applicable to each defendant were substantially the same, there was little likelihood of jury confusion. See Glass v. State, 289 Ga. 706, 708 (715 SE2d 85) (2011) (holding that "'[m]erely because three defendants are tried together is not cause for a severance'" (citation omitted)); Moon v. State, 288 Ga. 508, 510 (705 SE2d 649) (2011) (holding that "there was no likelihood of confusion

---

[8]The record shows that before trial, the trial court denied a motion by Chambers to sever his trial from that of his co-defendants. After the jury was selected, Chambers objected to the denial of his motion, and appellant joined in that objection. Appellant, however, never filed a motion to sever.

by the jury as to the evidence and the law because there were only two defendants 'who were jointly indicted for the same offenses, which involved the same witnesses, and the evidence indicated that they acted in concert'" (citation omitted)).  Also, the fact that the jury reached a different verdict as to Chambers than it did with regard to appellant and Pye indicates that it was not confused by the evidence and law.  See Thorpe v. State, 285 Ga. 604, 609 (678 SE2d 913) (2009) ("There is likewise no indication that the jury confused the evidence or law; all three defendants were charged with identical crimes, and the jury, in reaching different verdicts as to each co-defendant, proved itself amply capable of distinguishing the evidence relevant to each.").  Furthermore, any confusion represented by the jury's question regarding whether someone had to be aware of a weapon before she could be found guilty of possession a firearm would have applied equally to a separate trial, and Hicks points to no evidence that was admissible against one of her co-defendants that was not also admissible against her.  See Moon, 288 Ga. at 510 (holding that a co-conspirator's statements would have been admissible against the defendant in a separate trial);[9] Adams

---

[9] Former OCGA § 24-3-5, which was in effect at the time of appellant's trial, provided: "After the fact of conspiracy is proved, the declarations by any one of the conspirators during the pendency of the criminal project shall be admissible against all."  Under the new Georgia Evidence

v. State, 283 Ga. 298, 300 (658 SE2d 627) (2008) (holding that the acts of a co-conspirator committed during the conspiracy were admissible against the defendant).

Finally, although appellant and her co-defendants did have antagonistic defenses, "[t]hat alone . . . is insufficient to require severance, because 'unless there is a showing of resulting prejudice, antagonistic defenses do not automatically require a severance.'" Herbert v. State, 288 Ga. 843, 845 (708 SE2d 260) (2011) (citation omitted). Appellant argues that she was prejudiced by the joint trial because the evidence against her was weaker than the evidence against her co-defendants. "However, it is not enough for the defendant to show that he would have a better chance of acquittal at a separate trial or that the evidence against a co-defendant is stronger. The defendant must show clearly that a joint trial prejudiced his defense, resulting in a denial of due process." Id. (citations omitted). Appellant has failed to make that showing.

Judgment affirmed. All the Justices concur, except Benham and Hunstein, JJ., who dissent.

---

Code, which became effective January 1, 2013, the admission of co-conspirator statements is governed by OCGA § 24-8-801 (d) (2) (E).

S14A0396.  HICKS v. THE STATE

BENHAM, Justice, dissenting.

I would reverse because I conclude the trial court erred in denying appellant's motion for new trial on the ground of ineffective assistance of trial counsel.  First, I find ineffective assistance as a result of trial counsel's affirmative waiver of a legal right to have the trial court recharge the jury in response to the jury's question: "Would a defendant have to be aware of a weapons presence before a crime is committed to convict the defendant of possession of a firearm?"  In the course of discussing how to respond to this question, the court, the prosecutor, and defendants' counsel reached an agreement that the question called for a factual conclusion that should not be answered.  In fact, the question did not call for a factual conclusion but must reasonably be viewed as a question regarding a point of law, i.e., the circumstances pursuant to which a defendant may be deemed culpable for the acts of other parties to a crime or the acts of the defendant's co-conspirators in furtherance of the conspiracy.  The question thus called for a recharge on this issue.

"A trial court has a duty to recharge the jury on issues for which the jury requests a recharge, and the trial court commits reversible error if it fails to do so." *Dill v. State*, 277 Ga. 150, 151 (2) (587 SE2d 56) (2003). See also *Edwards v. State*, 233 Ga. 625, 626 (22 SE2d 802) (1975); *Glisson v. Glisson*, 268 Ga. 164, 165 (486 SE2d 167) (1997). That the jury was adequately instructed regarding appellant's liability as a conspirator for the crimes committed by her codefendants does not relieve the trial court from the duty to recharge in this case. To hold otherwise would eviscerate the well-established rule that a trial court has a duty to recharge when the jury so requests. The trial court's failure to recharge the jury on an essential element of the crimes for which appellant was tried would be reversible but for trial counsel's intentional waiver of the error.

"The necessity that the jury clearly understand the law in order to render a lawfully arrived-at verdict renders it imperative that pertinent points of law be repeated or clarified or both, to set the jury on the right course in the event of questions." *Glisson*, supra, 268 Ga. at 168. Included with the jury's question in this case was a statement that the jury still had not reached a verdict as to one of the defendants on certain counts of the indictment, namely aggravated assault

with a deadly weapon, armed robbery, and possession of a firearm while in the commission of the felony of aggravated assault. Since appellant was the only defendant for whom there was no direct evidence of knowledge that the other defendants were in possession of a firearm, it is obvious the jury was referring to appellant. Given the facts of this case, a rational jury could have found appellant possessed the intent to join in a conspiracy to commit theft by taking of the victim's wheel rims, but not to join in a conspiracy to commit any of the other felonies that involved possession of a firearm, because no evidence was presented that she was aware of the rifle prior to the commission of the crimes.[1]

The majority is correct that a co-conspirator to a robbery may be found guilty of felony murder based on armed robbery even without knowledge that her fellow conspirators had a gun when the co-conspirator had the intent to commit robbery. See *Williams v. State*, 276 Ga. 384, 386 (4) (578 SE2d 858) (2003). But *Williams* and other cases in which this rule has been applied involve the defendant's intent to engage in a conspiracy to commit robbery,

---

[1] That appellant picked up Pye and Chambers, and helped them flee with the rifle after a police officer arrived at the school parking lot where they were apparently trying to remove the rims from the victim's vehicle, may be evidence that she was an accessory after the fact, but she was not charged with that crime.

which by definition requires taking property from another person by force or intimidation. See OCGA § 16-8-40; see, e.g., *Crawford v. State*, 210 Ga. App. 36 (435 SE2d 64) (1993). For that reason, "a defendant can be convicted of armed robbery even though he might not have had knowledge that his accomplice was going to use a weapon to perpetrate it, so long as it can be found that use of the weapon by the accomplice was naturally or necessarily done in furtherance of the conspiracy to commit the robbery even though not part of the original agreement." *Crawford*, supra, at 38 (1). In this case, by contrast, no evidence was presented that appellant knowingly joined in a conspiracy to rob the victim by confronting him or to hijack his car. Instead, the evidence was consistent with the conclusion that appellant agreed to help her friends obtain access to the vehicle to reclaim rims that had been stolen from her friends, and that she did this by occupying the victim's brother so that he got rid of the other two women in the car, and by then getting the victim to go home for the evening and park the car so that the others could reclaim the rims. The evidence shows that as soon as she knew the victim had left to go home, she called Sanders. Accordingly, unlike in *Williams*, a jury could have found appellant was, at most, a conspirator to theft without finding that her accomplices' use of a firearm was

4

naturally or necessarily done in furtherance of that conspiracy.

For that reason, appellant is entitled to a new trial on the ground of ineffective assistance of trial counsel. The majority concludes that appellant could be convicted of the crimes in question even if she did not know about the weapon and that, accordingly, her claim of ineffective assistance is without merit. But a common criminal intent is required to establish that a defendant is a party to a crime. See *Jordan v. State*, 272 Ga. 395, 396 (530 SE2d 192) (2000). Pursuant to the specific facts of this case, with no evidence that appellant intended to engage in a conspiracy to rob the victim by force or intimidation, it was, as in *Glisson*, "imperative that pertinent points of law be repeated or clarified or both, to set the jury on the right course" since the jury raised a question that went to the heart of her culpability for the crimes charged. I conclude trial counsel erred by consenting to the trial court's refusal to recharge on these important issues and thereby waiving appellant's right to assert this error on appeal.

Further, I agree with appellant that her trial counsel was ineffective in that the record shows he did not adequately prepare her defense. Trial counsel failed to submit requests to charge that were tailored to the facts of this case, including

a charge on theft by taking. The only defense presented by trial counsel was that appellant was not knowingly involved in any manner in a criminal enterprise with her co-defendants. Given the weight of the evidence that appellant did participate in some criminal enterprise by manipulating the victim's activities and keeping the other conspirators informed of the location of the vehicle and its occupants, trial counsel performed deficiently by relying solely on this defense. In my opinion, effective counsel would have presented a more effective defense and a more compelling closing argument by urging that if the jury did find appellant was involved in a conspiracy to commit a crime in this case, they could find from the evidence that appellant was not involved in a conspiracy to commit armed robbery but participated, if at all, only with the intent to commit the lesser offense of theft. Applying the standard set forth in *Strickland v. Washington*, I conclude the facts demonstrate appellant's trial counsel performed deficiently and a reasonable probability exists that, but for these deficiencies, the outcome of the trial would have been more favorable to the appellant.

I am authorized to state that Justice Hunstein joins in this dissent.