303 Ga. 34
FINAL COPY

S17A1900.  WALLACE v. THE STATE.

PETERSON, Justice.

Jamad Jacque Wallace appeals his convictions for murder and other crimes arising from the fatal shooting of Alex Delgado-Ramos ("Delgado") in a drug store parking lot.[1] Wallace argues on appeal that the trial court erred by (1) failing to conduct an adequate inquiry prior to replacing a holdout juror with an alternate, and (2) informing the jury that two witnesses were held in contempt for refusing to testify on behalf of the State. He also argues that his trial counsel was ineffective for failing to prepare adequately for cross-examination of the

---

[1] Delgado was shot on March 4, 2012. On January 21, 2015, a Gwinnett County grand jury indicted Wallace for malice murder, two counts of felony murder, two counts of aggravated assault, one count of possession of a firearm by a first offender probationer, and one count of possession of a firearm during the commission of a felony. The jury found Wallace guilty on all charges at an April 2015 trial. The trial court imposed a sentence of life in prison on the malice murder count and a consecutive sentence of five years on the possession of a firearm during the commission of a felony count, and purported to merge all of the other counts into the malice murder count. Trial counsel on April 22, 2015, filed a motion for new trial, which was amended by appellate counsel. The trial court denied the motion in an order filed on March 3, 2017. Wallace filed a timely notice of appeal, and this case was docketed to the August 2017 term and submitted for a decision on the briefs.

State's primary witness. To the extent that Wallace has preserved these claims for appellate review, we find that they lack merit and affirm his convictions.

The State's primary witness was Delgado's girlfriend, Brittney Zevenbergen. According to her testimony, she and Delgado spent March 4, 2012, doing laundry, walking in a park, and shopping at Walmart. That evening, Delgado asked Zevenbergen to go with him to a CVS. Zevenbergen suspected that Delgado's plan was to purchase marijuana, as he smoked marijuana daily. Zevenbergen parked in the CVS parking lot, and Wallace got into the back seat. At some point, Zevenbergen heard Delgado say something like, "I thought you were cool[.]" Wallace pointed a handgun at Delgado's head and ordered him to empty his pockets; Zevenbergen tried to show Wallace the pockets were empty and insisted Delgado did not have a weapon. Wallace backed out of the car, still pointing his gun, and Delgado followed, despite Zevenbergen's attempts to pull him back. Zevenbergen heard more arguing and then two gunshots.

Wallace fled the scene. Zevenbergen found Delgado lying on the ground and bleeding from the head. Delgado later died of the gunshot wound. In addition to the bullet that hit Delgado, a bullet landed in the side-step of a vehicle that had been parked next to Zevenbergen's.

Wallace testified at trial, giving a version of events different from that relayed by Zevenbergen. According to Wallace, he and Delgado met earlier in the day on March 4 at a Kroger — at odds with the testimony of Zevenbergen, who said she and Delgado never went to a Kroger that day. Wallace claimed that he purchased a quarter of a pound of marijuana from Delgado, later realizing that the marijuana Delgado had sold him was not the quantity or quality it was supposed to be. Wallace said he and Delgado arranged to meet at the CVS; Wallace said he did not bring a gun or the marijuana but wanted to get his money back. Wallace claimed that he exited Zevenbergen's vehicle only after he heard what he thought was a gun being cocked. He claimed that Delgado came after him with his gun, the two men grabbed one another, and the gun discharged at a downward angle as Wallace pushed Delgado's hand away. Wallace said the gun went off again as the two continued to tussle, Wallace trying to turn the gun away from his own face.

The medical examiner testified that the weapon was fired from a distance of at least 30 inches. She testified that there was no stippling on Delgado, which she would have expected to find if Delgado were holding the gun himself when he was shot.

1. Although Wallace does not challenge the sufficiency of the evidence, it is our customary practice in murder cases to independently review the record to determine whether the evidence was legally sufficient. Having done so, we conclude that the evidence was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Wallace was guilty of the crimes for which he was convicted.  See Jackson v. Virginia, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Wallace argues that the trial court erred by failing to conduct an adequate inquiry before it replaced a holdout juror with an alternate juror. To the extent Wallace did not affirmatively waive this claim, he has not shown that the trial court abused its discretion.

The jury had deliberated for about nine hours (minus two lunch breaks) over two days when the jury foreperson sent a note to the trial court indicating that the jury had reached a verdict on three counts — felony murder, possession of a firearm by a first offender probationer, and possession of a firearm during the commission of a felony — but was at an impasse on the other four. With the agreement of the parties, the trial court gave a charge pursuant to Allen v. United States, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896). Less than an hour

4

later, the jury sent another note saying one "dissenting" juror did not want to deliberate further. The prosecutor indicated he would be in favor of taking a partial verdict. Defense counsel objected, asking the court instead to instruct the jurors that they all needed to participate in deliberations, then, "if that's still an issue," replace the holdout juror with the alternate and begin deliberations anew. Questioned by the court, the foreperson reported that the holdout juror showed no openness to discussing the case. Defense counsel told the court that she did not want to question the juror lest the juror "feel ganged up on" and surrender her position. At defense counsel's urging, the trial court excused the holdout juror without further instruction or inquiry, with the understanding that deliberations would begin anew with the first alternate the following day. In excusing the remaining jurors for the day, the trial court indicated that the court already had spoken to the alternate juror and summoned him to rejoin the jury the following day.

The following morning, before the alternate juror was brought into the courtroom with the rest of the jury, defense counsel told the trial court that she had received a voicemail from the released juror. Defense counsel stated that she had returned the dismissed juror's call but told the juror that she was not

5

comfortable speaking to her and directed her to contact the trial court if she had any concerns.[2] Defense counsel asked the trial court to bring the juror back for questioning, adding that she might ask for a mistrial depending on what the dismissed juror said. The State objected to bringing the dismissed juror back, noting that the juror's perspective may have changed since being excused: "[T]here's a difference between questioning someone before they're excused and where their mindset is and questioning them after they've been excused[,]" the prosecutor argued. In response, the trial court noted it had been prepared the previous day to take a partial verdict and declare a mistrial as to the remaining counts; defense counsel reiterated her objection to that course of action. The trial court rejected Wallace's request to recall the dismissed juror, concluding that "at this point in time it would not be appropriate to attempt to un-ring the bell." Less than two hours later, the newly-constituted jury convicted Wallace on all counts. The trial court subsequently announced that, before the holdout juror was replaced with the alternate, the jury had indicated that its agreement on the felony murder and firearm possession counts had been guilty verdicts on those

---

[2] The record shows that, as of the time that proceedings commenced that morning, the dismissed juror had not contacted the trial court's staff.

counts.

At the motion for new trial hearing, the dismissed juror said that she had participated in the deliberations that resulted in an agreement on some of the counts but things became "rough" when she would not agree on the other counts. She said she ultimately stopped talking during deliberations due to the hostility of other jurors, adding that if she said anything, "someone would probably like yell at me and throw papers." But the juror also affirmed that her mind would not have been changed. The trial court denied the motion for new trial, saying Wallace would have been convicted of "essentially" the same charges even if the dissenting juror had not been removed, as the court would have taken a partial verdict, including the guilty verdict on felony murder.

Wallace complains on appeal that the trial court's decision to replace the holdout juror with an alternate was not preceded by sufficient inquiry. But Wallace urged the trial court to dismiss the holdout juror without questioning her first. Affirmative waiver, as opposed to mere forfeiture by failing to object, prevents reversal. See Adkins v. State, 301 Ga. 153, 156 (2) (800 SE2d 341) (2017); Cheddersingh v. State, 290 Ga. 680, 683-684 (2) (724 SE2d 366) (2012). We thus do not consider Wallace's argument that the trial court erred in

7

dismissing the holdout juror and replacing her with an alternate. See Hicks v. State, 295 Ga. 268, 275 (2) (759 SE2d 509) (2014) ("[B]ecause appellant expressly told the trial court that it should not answer the [jury] question, appellant invited the alleged error, and it therefore provides no basis for reversal." (citation and punctuation omitted)).

The only argument on this point that Wallace did preserve is essentially an argument that the trial court erred the next day in refusing to reconsider its decision. It is not clear that he has properly asserted such an argument on appeal, however, as the enumeration of error set forth by Wallace does not mention the trial court's refusal to *reconsider* its decision but asserts only that the trial court "erred by failing to conduct an adequate inquiry prior to his decision to replace a 'lone hold-out' deliberating juror with an alternate juror." Although by his brief Wallace suggests that the trial court should have reconsidered, "an appealing party may not use its brief to expand its enumeration of errors by arguing the incorrectness of a trial court ruling not mentioned in the enumeration of errors." Felix v. State, 271 Ga. 534, 539 n. 6 (523 SE2d 1) (1999). By the time Wallace asked the trial court to question the holdout juror, the trial court already had replaced that juror with an alternate.

8

But even assuming that Wallace's argument that the trial court should have reconsidered is properly before us, we do not find a basis for reversal. OCGA § 15-12-172 authorizes a trial court to substitute the first alternate for an original juror if at any time "a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause[.]" We review a trial court's decision to substitute an alternate for an original juror for an abuse of discretion. See Williams v. State, 272 Ga. 828, 830 (5) (537 SE2d 39) (2000).

We acknowledge that alternate jurors generally should not serve to substitute for minority jurors who cannot agree with the majority, as taking such a minority position does not by itself render a juror incapacitated or legally unfit to serve, and making such a substitution may constitute an abuse of discretion. See Semega v. State, 302 Ga. App. 879, 881-882 (1) (691 SE2d 923) (2010); compare Moon v. State, 288 Ga. 508, 512-513 (5) (705 SE2d 649) (2011) (no abuse of discretion in removing holdout juror when concerns arose regarding her truthfulness and impartiality). But the trial court's decision to not recall a juror who already had been dismissed is quite different from merely replacing a holdout juror. The record provides no indication that, in dismissing that juror,

9

the trial court gave her any instruction that the usual strictures on jurors in active service still applied. It was only the following morning, after having a phone conversation with that juror, that defense counsel protested replacement of the juror. By that time, the alternate juror had returned to the courthouse after having been recalled and was ready to proceed. Although the trial court at that point did not take the step of summoning the dismissed juror back to the courthouse to question her, certainly the prospect of reinstating a juror who had been free from the constraints of juror service overnight was fraught with pitfalls, such as the potential that the juror spoke to others about the case, overheard someone else discussing the case, researched something related to the case, or otherwise encountered some extrajudicial information. See Dietz v. Bouldin, __ U. S. __, ___ (136 SCt 1885, 195 LE2d 161) (2016) (finding federal district courts have some limited power to recall a discharged civil jury for further deliberations, but declining to address whether a jury could ever be recalled in a criminal case and cautioning that trial courts should consider various factors that could lead to released jurors being "tainted"). Moreover, the trial court had been apprised that the dismissed juror had a telephone conversation with defense counsel, which itself could be a basis for the juror's

10

dismissal. See, e.g., White v. State, 287 Ga. 713, 718-719 (2) (699 SE2d 291) (2010) (no abuse of discretion in trial court's removal of juror who approached and engaged in apparently "innocuous" conversation with a member of the victim's family during a break in the trial; trial court and counsel suspected juror was trying to be removed from jury); Gurr v. State, 238 Ga. App. 1, 2 (4) (516 SE2d 553) (1999) (no abuse of discretion in replacing juror who was contacted about the case overnight by juror's former student); Swint v. State, 173 Ga. App. 762, 763 (5) (328 SE2d 373) (1985) (no manifest abuse of discretion in trial court's dismissal of prospective juror for cause where prosecutor reported seeing defendant's counsel talking to the prospective juror). The trial court did not abuse its discretion in declining to reconsider its decision to substitute an alternate for the holdout juror.[3]

3. Wallace also argues that the trial court erred by informing the jury that two witnesses were held in contempt for refusing to testify on behalf of the State. The trial court did not commit reversible error in this regard.

According to the State's proffer, the two witnesses, Andre Ross and

---

[3] We do not endorse the trial court's apparent conclusion that the replacement of the holdout juror was of no matter because Wallace would have been convicted of "essentially" the same charges if the trial court had taken a partial verdict from the deadlocked jury.

11

Stacey Samuel, informed police that Wallace had admitted to shooting the victim while attempting to rob him. Ross and Samuel refused to testify at trial and were held in contempt.[4] Defense counsel indicated that she objected to both of two options presented by the court — to the witnesses being brought before the jury to assert their refusal to testify, and to the court merely informing the jury that they had refused to testify and been held in contempt — but she preferred the latter option of the court informing the jury. Later on, Sergeant Shelly Millsap testified that his investigation included interviewing Ross and Samuel and the investigation identified Wallace as a possible suspect, although Sergeant Millsap did not explicitly tell the jury what Ross and Samuel told him. Based on this testimony, defense counsel called for a mistrial, which the trial court denied. After Millsap finished testifying, the trial court informed the jury that Ross and Samuel were held in contempt based upon their refusal to testify on behalf of the State, over a renewed objection by Wallace.

Wallace argues on appeal that these remarks by the trial court introduced

---

[4] Ross's lawyer indicated that he had advised his client to assert his Fifth Amendment right, but the trial court granted Ross immunity. Samuel's lawyer said her client did "not have the same Fifth Amendment issues."

information that was not relevant to the jury's consideration of the case.[5] But Wallace did not raise this argument before the trial court, merely making a vague objection that the remarks would give rise to a "negative inference" against him. Where an appellant did not state the basis for his objection to the trial court, the claim of error is not preserved for ordinary appellate review. See OCGA § 24-1-103 (a) (1); Anthony v. State, 302 Ga. 546, 549 (II) (807 SE2d 891) (2017) ("An issue that is not presented or ruled on by the trial court is not preserved for appellate review."). We thus review Wallace's claim only for plain error. See OCGA § 24-1-103 (d).

It is true that in a similar case we have questioned the relevance of a State witness's refusal to testify. See Hendricks v. State, 283 Ga. 470, 472-473 (3) (660 SE2d 365) (2008). The better practice here would have been for the trial court not to have informed the jury of the witnesses' refusal to testify. But given that Wallace failed to preserve his objection, he bears the burden to show that the complained-of error probably affected the outcome of his case. See Bozzie

_____

[5] This court has held that comments like those here are not an expression of opinion as to what has been proven, which would be impermissible under OCGA § 17-8-57. See Hendricks v. State, 283 Ga. 470, 473 (3) (660 SE2d 365) (2008). As in Hendricks, the trial court here merely referred to undisputed facts. See id.

13

v. State, 302 Ga. 704, 707 (2) (808 SE2d 671) (2017). Generally speaking, there is no harm to a defendant in a witness simply refusing to testify in the jury's presence. See Hendricks, 283 Ga. at 473 (3).[6] Compare Horne v. State, 281 Ga. 799, 804-809 (5) (642 SE2d 659) (2007) (finding Confrontation Clause violation where State posed to witness who refused to testify a series of leading questions that laid out in detail the State's case, but concluding error was harmless in part due to strength of evidence). And we have found that informing a jury that a State witness was held in contempt for refusing to testify despite a grant of immunity is unlikely to prejudice a defendant. See id.

Wallace argues that the trial court's remarks were prejudicial in that they "compounded the unavoidable inference" from Millsap's testimony that Samuel and Ross refused to testify because their testimony would harm the defense. But that inference does not actually follow from Millsap's testimony. Rather, the reference to the witnesses in Millsap's testimony is disconnected from the

---

[6] More specifically, we reiterated in Hendricks that a "witness'[s] in-court invocation of his Fifth Amendment rights is not necessarily harmful." 283 Ga. at 473 (3) (quoting McIntyre v. State, 266 Ga. 7, 11 (5) (463 SE2d 476) (1995) (punctuation omitted)). Although in this case each of the witnesses either did not invoke his Fifth Amendment right or was granted immunity, we noted in Hendricks that the witness at issue there had received an oral offer of immunity by a prosecutor. Id. at 472 (3).

14

question about when law enforcement learned of Wallace as a suspect:

> Q Did that [investigation] include interviewing two individuals
> . . . one named Stacey Samuel and one named Andre Ross?
> A Yes, sir.
> Q All right. And your investigation continued; is that correct?
> A That's correct.
> Q All right. At some point during the investigation, did you obtain
> information of a possible suspect?
> A Yes, sir.
> Q And what was the name of that possible suspect?
> A Jamad Wallace.

Here, the jury was given no clue as to the expected nature of the testimony of Ross or Samuel. But even if, as the defense argues, the trial court's remarks did give rise to some suggestion that Ross and Samuel would point to Wallace as the perpetrator in the shooting of Delgado, such a suggestion is not at odds with Wallace's defense at trial. Wallace did not point to another perpetrator but claimed essentially that Delgado accidentally shot himself while tussling with Wallace. He makes no argument as to how the jury would have gleaned something from the trial court's remarks that was contrary to that defense. He has not met his burden to show that the trial court's remarks prejudiced his case. See, e.g., Proctor v. State, 235 Ga. 720, 723-725 (221 SE2d 556) (1975) (error in allowing written statements of witnesses and defendant to go out with the jury

15

was harmless in part because the statements were consistent with defense theory of self-defense); Richardson v. State, 265 Ga. App. 711, 716 (1) (595 SE2d 565) (2004) (any error in admission of defendant's statement to police was harmless given that statement was substantively the same as statements he made to other witnesses who testified and was consistent with his theory of defense), disapproved on other grounds by Brown v. State, 290 Ga. 865, 869 (2) (b) (725 SE2d 320) (2012).

4. Finally, Wallace argues that his trial counsel rendered ineffective assistance of counsel in failing to prepare adequately for cross-examination of Zevenbergen. This claim also fails.

In order to establish that trial counsel was ineffective, Wallace must show both that trial counsel's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). In order to establish prejudice, the defendant must show that a reasonable probability exists that, but for trial counsel's errors, the outcome of the trial would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In denying Wallace's motion for new trial, the trial court

16

found that trial counsel was "obviously" prepared for trial and "thoroughly" cross-examined the State's witnesses. "We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." Robinson v. State, 277 Ga. 75, 76 (586 SE2d 313) (2003) (citation and punctuation omitted).

Wallace alleges two shortcomings in trial counsel's preparation for cross-examination. First, he suggests that trial counsel may not have reviewed Zevenbergen's previous statements to law enforcement in preparing for trial, pointing to trial counsel's testimony from the motion for new trial hearing in which, he says, trial counsel testified that she could not remember if she had done that. But trial counsel in fact testified that she did use Zevenbergen's two prior statements to prepare for her cross-examination.[7] Wallace's argument that trial counsel did not review Zevenbergen's previous statements as part of her trial preparation is not supported by the record and does not demonstrate that the trial court's factual finding was clearly erroneous.

---

[7] Although trial counsel testified that she did not remember whether she was able to point out any inconsistencies in Zevenbergen's statements, she did cross-examine Zevenbergen about the fact that she had testified in a previous hearing that the gun used by Wallace was silver, while testifying at trial that the gun was black.

17

Wallace also argues that trial counsel made inadequate efforts to obtain telephone records that might have impeached Zevenbergen's testimony.[8] The trial court did not specifically address this alleged failure in denying the motion for new trial. But Wallace did not tender any such phone records after trial, offering mere speculation as to what such records might have shown. Thus, even if trial counsel acted deficiently in this regard — an issue we do not decide — Wallace cannot show prejudice from trial counsel's failure to obtain the records. See Woods v. State, 275 Ga. 844, 849-850 (3) (d) (573 SE2d 394) (2002) (defendant cannot show prejudice from counsel's failure to use videotape at trial, where defendant never introduced the tape itself into evidence). Wallace cannot prevail on his claim of ineffective assistance of counsel.

Judgment affirmed.  All the Justices concur.

_____

[8] Trial counsel testified that her investigator told her the records would be unavailable due to the passage of time.

Decided February 5, 2018.

Murder. Gwinnett Superior Court. Before Judge Hamil.

Maryann F. Blend, for appellant.

Daniel J. Porter, District Attorney, Lee F. Tittsworth, Nigel R. Lush, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General, for appellee.