NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: August 26, 2025

S25A0794. WALTON v. THE STATE.

MCMILLIAN, Justice.

Richard Walton appeals his convictions for felony murder and other offenses in connection with the shooting death of Brian Christopher Johnson.[1] On appeal, Walton contends that the trial

---

[1] Johnson died on October 19, 2016. On December 30, 2016, a Washington County grand jury jointly indicted Walton and Clifford Duckworth, III, for malice murder (Count 1), felony murder predicated on aggravated assault (Count 3), armed robbery (Count 5), aggravated assault (Count 7), and four counts of possession of a firearm during the commission of a felony (Counts 2, 4, 6, and 8). Duckworth's charges were later dismissed without prejudice. At a trial held from March 7 through March 9, 2018, the jury acquitted Walton on the malice murder count and on one firearm count but found Walton guilty on all remaining counts. The trial court sentenced Walton as a recidivist offender to serve two concurrent life sentences in prison without the possibility of parole for felony murder (Count 3) and for armed robbery (Count 5), plus consecutive five-year sentences in prison for the related firearm counts (Counts 4 and 6) to be served concurrent with each other. Counts 7 and 8 merged with Counts 3 and 4, respectively, for sentencing purposes.

Walton filed a timely motion for new trial on March 15, 2018, which he amended through new counsel on September 5, 2019. After the hearing held from February 6 through March 5, 2020, the trial court denied Walton's motion

court erred in denying his motion for a directed verdict and committed reversible error in admitting certain evidence. Walton also contends that his trial counsel rendered constitutionally ineffective assistance in several respects and that he was prejudiced by cumulative harm resulting from trial counsel's alleged deficiencies. Because we conclude that Walton did not preserve his claim of error with respect to his motion for a directed verdict, the trial court did not plainly err in admitting the evidence contested by Walton, and Walton failed to show constitutionally ineffective assistance by his trial counsel, largely through his abandonment of most of those claims, we affirm.

The evidence presented at trial showed that on the morning of October 19, 2016, Johnson left his home in Tennille, Georgia, that he shared with his fiancée and children to ride to work with his employer. At the time, Johnson had his wallet, identification, food stamp card, a cell phone, and approximately $45 in cash. He also

for new trial, as amended, on August 23, 2024. Walton timely filed a notice of appeal on September 17, 2024, and the case was docketed to this Court's April 2025 term and submitted for a decision on the briefs.

received $120 in cash after working that day. On his way home, Johnson purchased beer and a bottle of liquor and then was dropped off near his home sometime around 4:00 p.m. One of Johnson's neighbors, Jerry Hooks, saw Johnson begin walking across a nearby field after exiting his employer's vehicle. Although Hooks testified that he did not know Johnson's destination at the time, Hooks confirmed that a woman named "Lilly" hosted card games in the area.

Around 5:30 or 6:00 p.m., Johnson arrived at his cousin's house at Parson's Crossing in Sandersville, where he was met by his cousin, Darlene Poole, Poole's son, Jeffrey, and one of Poole's neighbors, Gary Worthen. At the time, Johnson was riding in a red Dodge truck with two other men later identified as Walton and Duckworth. The three men stopped by Poole's house because Johnson wanted to see her for her birthday. According to Poole, she asked Johnson about the men with him, and Johnson explained that the two men were his cousin-in-law and a friend. She further recalled seeing that Walton, who only briefly exited the vehicle to

3

change seats, "had [a] coat tied on his hand." Jeffrey testified that he recalled seeing that the men also had cocaine and marijuana with them. Poole, Jeffrey, and Worthen each claimed that Johnson appeared intoxicated and possibly on drugs when he arrived at Poole's house but otherwise happy and as though he were having a good time with the two men. After giving his cousin a couple of dollars for her birthday and explaining that his remaining cash was for his rent and light bill, Johnson stated that he was going to Riddleville to "handle some business." He then left with Walton and Duckworth.

In the early morning hours of the next day, Johnson's body was discovered on a dirt road that travels toward Riddleville, in a wooded area, and located only a few miles from Parson's Crossing. He had a single gunshot wound to the face, and three of his pants pockets were pulled inside out. Only a receipt and $0.25 were found with his body; he had no wallet, cash, identification, or cell phone. A single, spent .40-caliber cartridge casing was found above his head on the roadway. Other than the single gunshot wound to Johnson's face,

4

the crime scene showed no other signs of violence or evidence of a struggle. Johnson's autopsy revealed that he died from the gunshot wound. The medical examiner testified that no soot or stippling was found on Johnson's body, suggesting that the gun that killed Johnson was fired from several feet away or closer but with something between the gun's muzzle and Johnson.

That same day, officers interviewed family and witnesses and learned that Johnson was last seen with Walton and Duckworth; that the truck that the men rode in belonged to Duckworth; and that Johnson had a cell phone that was last active near Walton's residence that day. Moreover, officers learned from Duckworth's girlfriend that Duckworth told her about the events leading to Johnson's death. After interviewing Duckworth and further investigation, officers obtained video surveillance from a liquor store and gas station that confirmed portions of the route that Duckworth's truck had reportedly taken that day. Officers also obtained and executed search warrants for Duckworth's truck and Walton's house. While searching the truck, officers discovered and

took samples of what appeared to be blood on the rear driver's side bumper and collected six pieces of paper with handwritten notes that appeared to be "gang type literature," including a "gangster prayer," from the center console. Searching Walton's house led to the additional discovery of what appeared to be blood on a pair of Walton's tennis shoes and blue jeans, which were also collected as evidence. In Walton's backyard, officers observed a 55-gallon barrel reportedly used as a burn barrel. Although officers searched through the top few inches of its wet contents, they found nothing of evidentiary value and did not search any further. Officers did not find any of Johnson's missing possessions, including his wallet or cell phone.

While other officers searched Walton's home, the lead GBI case agent, Eugene Howard, interviewed Walton about the prior day's events.[2] During that interview, Walton initially stated that he saw Johnson earlier at Lilly's house and that he, Johnson, and

---

[2] Walton's October 20, 2016, interview was video-recorded and played in full for the jury.

Duckworth shared a bottle of alcohol. Walton denied going anywhere else after Duckworth took him home, except to purchase lottery tickets. But, after being confronted about witnesses seeing him at Parson's Crossing and with the fact that officers had obtained videos confirming that Duckworth's vehicle was seen at two other locations, Walton changed his story. He then admitted that he had gone to Parson's Crossing and to the gas station and liquor store seen in those videos. Nevertheless, when asked whether he was present at the location where the murder occurred, Walton denied being there. He also denied having a physical altercation with Johnson and that Johnson's blood would be on his belongings for any reason.

Walton was arrested the following day on October 21, 2016. Following his arrest, he voluntarily submitted to another interview with Agent Howard, during which he admitted in response to questioning that he was once "head of security" for the criminal street gang Gangster Disciples.[3] However, upon being interrogated

---

[3] Walton's October 21, 2016, interview was audio-recorded. Only the portion of the audio recording concerning Agent Howard's attempts to question Walton about Johnson's shooting was played for the jury.

specifically about the murder, Walton ended the interview, telling Agent Howard that he "didn't want to make any comment," and that he was "waiting to see what [the investigators] got."

Weeks later, after learning that the murder weapon – a High Point .40-caliber pistol – was owned by and came from Duckworth's "brother," Darius Lawrence, officers located the firearm in Baldwin County where Lawrence lived. Although unable to confirm that the bullet recovered from Johnson's body was fired from Lawrence's firearm, a GBI firearms examiner confirmed that the spent cartridge casing found near Johnson's body was fired from that weapon. Additionally, although testing of the stains found on Duckworth's truck bumper and on Walton's blue jeans was inconclusive for blood, the GBI crime lab confirmed the presence of Johnson's blood on both of Walton's tennis shoes.

At trial, the State presented testimony from Kavionne Robertson, who was Duckworth's girlfriend around the time of the murder, and from David Mitchell, who was Walton's cellmate while Walton was awaiting his trial. Robertson testified that an

intoxicated Duckworth came to her home the night of the shooting around 8:30 p.m., crying and shaking. Duckworth told her that he was riding in his truck with two other men on a dirt road, heading "somewhere to pick something up," when one of the men identified as "Rick" asked Duckworth to pull over to use the restroom. After doing so, an argument occurred between Rick and the other man, during which Rick walked back to the truck, pulled out a gun, and then shot the other man in the face.

Mitchell testified that Walton similarly told him that Walton was riding in a pickup truck with Duckworth and Johnson when Walton and Johnson began arguing about "money or something." According to Mitchell, Walton stated that he made Duckworth stop on a dirt road near Riddleville, shot Johnson in the face using Duckworth's .40-caliber firearm, "wound up with [Johnson's] phone and his wallet," and then burned both items in a barrel behind his residence. When asked about Walton's gang affiliation, Mitchell testified that Walton told him that he was "in enforcement" in the Gangster Disciples.

9

The State also presented testimony from Captain Trey Burgamy with the Washington County Sheriff's Office, who was tendered as a gang investigations expert, and from Lawrence about his experiences with the Gangster Disciples and concerning how his firearm became involved in the shooting. Burgamy testified that the Gangster Disciples is a Chicago-based street gang with a presence in Georgia; that the gang's chain of command includes a chief of security, who protects the gang members, and a chief enforcer, who enforces the gang's rules; and that the chief enforcer is the person who authorizes the killing or physical punishment of anyone who violates the gang's rules. Burgamy further testified that, to become a member, the gang requires recruits to commit a crime typically involving homicide, prostitution, or firearms.

Lawrence, who admitted to being a longtime member of the Gangster Disciples, testified that Duckworth was also a Gangster Disciples member. Lawrence also claimed that there was no real difference between the gang's head of security and the gang's enforcer; that, in both positions, one could authorize unlawful acts

for retribution or retaliation; and that if Walton was head of security, Walton could authorize such acts. Regarding the murder weapon, Lawrence maintained that he did not know that his firearm was involved until after officers came to his home to collect the weapon. Yet, on cross-examination, Lawrence admitted that Duckworth had previously requested to borrow his firearm. Lawrence was also impeached with his recorded statement, in which he admitted that Duckworth was not a full-fledged member of the Gangster Disciples and that Duckworth told him that his firearm was involved in the shooting after an argument about money. Burgamy and Lawrence both confirmed that the notes found in Duckworth's truck were legitimate Gangster Disciples literature.

1. Walton contends in his brief that the trial court erred in denying his motion for a directed verdict as to "Count 4 Felony Murder based upon armed robbery and Count 5 Possession of a firearm during the commission of the armed robbery." Although not enumerated as error, Walton also appears to assert a sufficiency of the evidence claim with respect to those two counts. These claims

11

fail for several reasons.

To begin, Count 4 of his indictment did not charge him with felony murder predicated on the commission of an armed robbery. In fact, Walton was not charged with that offense at all. Instead, the trial record shows that *Count 3* charged him with felony murder predicated on *aggravated assault*. Because Walton did not move for a directed verdict on the grounds that he now asserts on appeal, Walton's claim that the trial court should have granted a directed verdict on the non-existent charge of felony murder predicated on armed robbery has not been preserved and necessarily fails. See *Clements v. State*, 317 Ga. 772, 788–89 (2023) (concluding that the defendant failed to preserve his claim of error in the trial court's denying a motion for a directed verdict for certain counts of the indictment because the defendant did not move for a directed verdict on those counts at trial).

Next, while Walton was charged with possession of a firearm during the commission of an armed robbery, which was designated as *Count 6* of his indictment rather than Count 5 as he alleges, the

12

subject of his motion for a directed verdict at trial was solely *armed robbery*. Walton never moved the trial court for a directed verdict on the related firearm count. Accordingly, Walton's argument with respect to the firearm count was also not preserved for our review. See *Clements*, 317 Ga. at 788–89.

Moreover, to the extent that Walton asserts that the evidence was not sufficient as a matter of constitutional due process to support his convictions, we conclude that the claim has been abandoned. We have previously declined to address arguments, like this one, that were not enumerated as error. See, e.g., *Mims v. State*, 310 Ga. 853, 854 n.2 (2021) (declining to address passing argument regarding competency issue not enumerated as error, citing *Wallace v. State*, 303 Ga. 34, 37–38 (2018) ("[A]n appealing party may not use its brief to expand its enumeration of errors by arguing the incorrectness of a trial court ruling not mentioned in the enumeration of errors.")). Moreover, Georgia Supreme Court Rule 22(1) provides that, in all briefs filed in cases, except those involving death penalty matters, "[a]ny enumerated error or subpart of an

enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned." Walton's entire sufficiency argument is: "There was insufficient evidence, even in the light most favorable to the State, that the murder transpired from anything other than an argument." We have declined to address sufficiency arguments under similar circumstances. See, e.g., *Byrd v. State*, 321 Ga. 222, 226 (2025).

2. Walton also enumerates as error that the trial court should have granted his motion in limine and excluded evidence about his gang affiliation and activity from trial as impermissible "other acts" evidence under OCGA § 24-4-404(b) ("Rule 404(b)").[4] However,

---

[4] OCGA § 24-4-404(b) provides, in pertinent part, that "[e]vidence of other crimes, wrongs, or acts shall not be admissible to prove the character of a person in order to show action in conformity therewith." However, such evidence may be admitted for other purposes, including to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Id. The party offering other acts evidence for a proper purpose under Rule 404(b) "must show that (1) it is relevant to an issue in the case other than the defendant's character; (2) its probative value is not substantially outweighed by its unfair prejudice under OCGA § 24-4-403; and (3) there is sufficient proof for a jury to find by a preponderance of the evidence that the defendant committed the other act." *Mitchell v. State*, 317 Ga. 107, 110 (2023). On appeal, Walton addresses only the first and second prongs of this test.

14

despite generally asserting that the trial court erred in denying his motion in limine that sought to exclude all gang related evidence associated with him, including but not limited to testimony by Agent Howard and Mitchell concerning Walton's statements that he was a member of the Gangster Disciples, Walton only specifically points to the trial testimony describing the gang literature and argues that the evidence should have been excluded. Therefore, we limit our consideration to whether this evidence should have been admitted under Rule 404(b), as Walton has abandoned his claim to the extent that his motion in limine requested exclusion of other gang evidence, including his statements admitting to his gang membership. See Ga. Sup. Ct. R. 22(1). See also *Johnson v. State*, 321 Ga. 422, 426 (2025) (deeming claim that the trial court erred in admitting gang membership evidence abandoned, where the defendant failed to make any arguments or cite to the record in support of his claim).

Walton first argues that the description of the six pieces of paper found in Duckworth's truck as "gang type literature" that included a "gangster prayer" was not relevant to proving murder. As

support, he asserts that the State's theory of the case at trial was that he shot Johnson following an argument, and the State failed to introduce evidence showing that the murder was gang related. In arguing the prejudice prong under the Rule 404(b) test, Walton asserts that "once the gang inference is made, it is unfairly and overwhelmingly prejudicial," and that the evidence "should have been restricted from the jury's hearings [sic] as it was more unfairly prejudicial than probative."

As an initial matter, our review is for plain error only because Walton failed to preserve this claim for ordinary appellate review. See *Huff v. State*, 315 Ga. 558, 564 (2023) (noting that only plain error review is available for an unpreserved challenge to the admission of alleged improper character evidence, in the form of testimony that the defendant held a "gangster style" gun). The trial record shows that Walton's motion in limine seeking to exclude gang evidence made no reference to Rule 404(b) and instead only asserted that the evidence was not relevant and more prejudicial than

16

probative under OCGA §§ 24-4-402 and 24-4-403.[5] In denying the motion, the trial court ultimately ruled that it would determine the admissibility of the contested gang evidence in each instance where the State sought to introduce the evidence at trial, if requested by counsel or deemed necessary by the trial court in its discretion. But the trial transcript reveals that, although Walton did object to the testimony describing the gang literature at trial, his objection simply reminded the trial court of his motion in limine, which asserted different grounds for exclusion than what Walton now raises on appeal.

Because Walton did not preserve this Rule 404(b) claim for ordinary review, we consider whether the trial court's decision not to exclude the contested gang evidence constitutes plain error under the standard set forth in *Gates v. State*, 298 Ga. 324, 326–27 (2016)

---

[5] Regarding the admission of evidence at trial, OCGA § 24-4-402 provides, in pertinent part, that "[e]vidence which is not relevant shall not be admissible." OCGA § 24-4-403 provides that "[r]elevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

(adopting the federal plain error standard for reviewing claims of unpreserved evidentiary error under OCGA § 24-1-103(d)).

To establish plain error:

First, there must be an error or defect – some sort of "[d]eviation from a legal rule" – that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it "affected the outcome of the trial court proceedings." Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error – discretion which ought to be exercised only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"

*Gates*, 298 Ga. at 327 (quoting *Kelly v. State*, 290 Ga. 29, 33 (2011) (punctuation and emphasis omitted)). This Court has explained that "[s]atisfying all four prongs of this standard is difficult, as it should be." *Huber v. State*, 319 Ga. 78, 86 (2024) (citation and punctuation omitted). And this Court need not analyze all prongs of the plain error standard where the appellant fails to establish any one of them. See *Williams v. State*, 315 Ga. 490, 496 (2023).

18

Assuming without deciding that the trial court clearly erred in admitting into evidence the testimony concerning the gang literature under Rule 404(b), we conclude that Walton has not established that the alleged error affected his substantial rights. In his brief, Walton makes only conclusory assertions about prejudice to support his claim and fails to provide any substantive argument demonstrating how the admission of the contested gang evidence affected his trial's outcome. Moreover, that evidence was cumulative of other admitted evidence. Agent Howard and Walton's cellmate, Mitchell, both testified that Walton admitted to being a gang member. Walton did not object to that testimony at trial and has abandoned any claim regarding its admission on appeal. Finally, the evidence introduced at trial supporting Walton's guilt was strong. The trial evidence included testimony that Walton admitted to shooting Johnson on a dirt road near Riddleville, taking Johnson's wallet and cell phone, and then burning both items in a barrel behind his home. Those admissions were corroborated by other witnesses testifying to seeing Walton with Johnson a few miles from

19

the murder scene, during the hours immediately before the shooting; Robertson testifying that Duckworth told her that Walton shot Johnson on a dirt road; Agent Howard testifying to Walton's confirming during one of his recorded police interviews that he was with Johnson in the hours before the shooting, as revealed by witnesses and video surveillance; and other witnesses testifying that Johnson's body was found on a dirt road that traveled toward Riddleville, with his pants pockets pulled inside out, and his wallet and cell phone missing. The trial evidence also included testimony that Johnson's cell phone was last active near Walton's home on the day that Johnson was killed. Lastly, forensic evidence was introduced showing that Johnson's blood was found on both of Walton's tennis shoes. Given this strong evidence supporting his convictions, the cumulative nature of the contested gang evidence, and Walton's superficial treatment of this claim, Walton has not shown that any error in the admission of the testimony regarding the gang literature likely affected the outcome of his trial. See *Johnson v. State*, 319 Ga. 562, 572 (2024) (holding that the appellant

failed to show that the alleged error affected his substantial rights, where the contested testimony was cumulative and the evidence of guilt was overwhelming); *Pittman v. State*, 318 Ga. 819, 830 (2024) (holding that the appellant failed to show that the alleged error in admitting his statements likely affected his trial's outcome, considering the overwhelming evidence of guilt and the appellant's cursory treatment of the claim). Accordingly, there was no plain error.

3. Walton next contends that the trial court erred in permitting the State to use a transcript that the State prepared to assist the jurors in listening to Walton's first recorded police interview without the trial court first making a specific finding of accuracy concerning the transcript and instructing the jury accordingly. Specifically, he asserts that the trial court should have "factually determine[d] the accuracy of the transcript" before permitting its use and, acknowledging that the trial court gave limiting instructions to the jury, he argues that the trial court erred in not including a specific

21

finding that the transcript was accurate.[6]

As Walton concedes, this claim is subject to plain error review, because he did not object to the trial court's instructions or the transcript's use at trial. See OCGA § 24-1-103(d). See also, e.g., *Horton v. State*, 310 Ga. 310, 319–21 (2020) (reviewing unpreserved instructional error claim for plain error); *Rickman v. State*, 304 Ga. 61, 63 (2018) (reviewing unpreserved claim contesting the admission of photographs used as a demonstrative aid for plain error). Here, Walton has failed to meet his burden as to the standard's third prong, requiring that the error likely affected the outcome of the proceedings. See *Gates*, 298 Ga. at 327 (reviewing unpreserved

---

[6] To support his claim, Walton cites only two cases from the Court of Appeals – *Montgomery v. State*, 173 Ga. App. 570, 572 (1985), and *Elliott v. State*, 168 Ga. App. 781, 785–86 (1983). We note that neither case cited by Walton stands for the proposition that a trial court must make findings of accuracy before allowing a transcript to be used as a demonstrative aid. See *Montgomery*, 173 Ga. App. at 572 (holding that the trial court did not err in permitting the use of certain transcripts, as a proper foundation had been laid, they were used for the limited purpose of allowing the jurors to follow along with the recordings, the trial court charged the jury on that limited use, and the transcripts were not admitted into evidence); *Elliott*, 168 Ga. App. at 785–86 (holding that the trial court did not abuse its discretion in permitting the use of a transcript that it determined was accurate, and explaining that such use is permissible when a proper foundation has been laid).

22

evidentiary claim for plain error); *Kelly*, 290 Ga. at 33 (reviewing unpreserved instructional claim for plain error).

The record reveals that, when the State sought to introduce the video recording of Walton's police interview, the State laid a foundation for its admission by eliciting testimony from the interrogating officer, Agent Howard, who testified that he was familiar with the recording, had reviewed it, and had determined that it was a true and accurate depiction of his interview with Walton. The State then requested permission to provide the jurors with copies of a transcript of the recording that had been professionally prepared, albeit not certified by a court reporter, to aid the jurors in following along with the recording. In connection with the use of that transcript, the trial court instructed the jury as follows:

> Ladies and Gentlemen, the Prosecution has prepared a transcript from the – from this interview. Now, it is their – it's the Prosecution's understanding of what was said. You heard an audio yesterday and you know how difficult it was to understand. So this is not something that a court reporter has prepared and certified. … So do you understand it's what they say the audio says. Which you'll

23

be listening to the audio. So don't be bound by the transcript. It can be helpful to you, but remember you've got to make the decisions in the long run about what it says.

Upon defense counsel's request, the trial court further instructed the jury that: "The evidence is the audio, not the transcript. You're not going to have these transcripts in the jury room to deliberate. … It's merely demonstrative as we say in nature to use the transcripts." Finally, after resolving some concerns that arose during the playing of the recording about necessary redactions to the recording and transcript outside the presence of the jury, the trial court reiterated to the jury upon its return to the courtroom: "[R]emember what I told you, this is the State's version of what they say is said on the audio. But what you actually hear on the audio, if you hear it differently, the audio is the evidence as well as the video."

Even assuming clear or obvious error, Walton has not carried his burden of showing that the outcome of the trial likely would have been different had the trial court first made findings about the accuracy of the transcript and instructed the jury about those

findings. That is because Walton does not assert that the transcript was an inaccurate representation of what was said on the recording, and the record on appeal does not include a copy of the transcript for that determination to be made. See *Crawford v. State*, 288 Ga. 425, 427 (2011) ("An appellant has the burden of proving trial court error by the appellate record, and must compile a complete record of what transpired in the trial court."). Moreover, the trial court instructed the jury that the transcript was not evidence and that the audio was the evidence that the jury should consider. "Qualified jurors are presumed to follow jury instructions." *Schmitt v. State*, 318 Ga. 835, 846 (2024). For these reasons, this claim fails.

4. Walton contends that the trial court abused its discretion under Rule 404(b) in allowing evidence to be admitted at trial that he went to prison on an unrelated criminal charge and in not sua sponte giving a curative instruction related to that evidence.

The trial record reveals that Mitchell testified that he was Walton's cellmate at the Washington County jail from December 2016 to July 2017, and, during that time, Walton told him about the

25

events leading to Johnson's shooting and Walton's actions during those events. Defense counsel cross-examined Mitchell about the source of his knowledge of the specific facts related to the crimes and accused Mitchell of having read Walton's discovery materials. In response, Mitchell denied the accusation and claimed that "[Walton] was still waiting on his discovery package after [he and Walton] parted ways." On redirect, the State asked Mitchell: "Just to clarify, when you left [the jail] – who left first, you or Mr. Walton?" Mitchell's response that Walton now challenges on appeal was: "Mr. Walton left and went to prison."

Because Walton did not object to Mitchell's testimony or request a curative instruction at trial, we review these issues for plain error only. See *Davis v. State*, 302 Ga. 576 (2017) (unpreserved Rule 404(b) objection to testimony concerning the defendant's prior altercations and trial court's failure to sua sponte give a limiting instruction reviewed for plain error). We conclude that Walton has failed to show clear or obvious error, as required under the second prong of the plain error standard. As even Walton concedes,

26

Mitchell's testimony that Walton went to prison was unresponsive to the question being asked by the State and was fleeting and undetailed, such that the passing reference to Walton's going to prison, without more, would not lend itself to the inevitable conclusion that Walton had unrelated criminal charges against him and thus did not impugn Walton's character. See *Swims v. State*, 307 Ga. 651, 655 (2020) ("A passing reference to a defendant's incarceration does not place his character in evidence."); *Wade v. State*, 304 Ga. 5, 10 (2018) (holding that the unresponsive, brief testimony that the defendant stated that he was "not going back to prison" did not place the defendant's character in issue in violation of Rule 404(b)). "Given that our case law runs contrary to [Walton's] position, it cannot be seriously contended that the trial court committed 'clear or obvious' error" in allowing Mitchell's testimony into evidence. *Kelly*, 290 Ga. at 34 (holding that the trial court did not commit clear or obvious error, where the appellant's argument conflicted with controlling precedent).

And, with respect to Walton's argument that the trial court

should have given a curative instruction, the alleged error was also not clear or obvious, because Walton has not identified any controlling precedent that requires a trial court to give a curative instruction under these circumstances, and we are not aware of any such authority. See *Simmons v. State*, 299 Ga. 370, 374 (2016) ("An error cannot be plain where there is no controlling authority on point."). Accordingly, Walton's claim of plain error fails.

5. Walton contends that the trial court plainly erred in allowing Robertson to testify to Duckworth's out-of-court statements to her about the events leading to Johnson's death in violation of the Confrontation Clause contained in the Sixth Amendment of the United States Constitution. See generally US Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right … to be confronted with the witnesses against him."). In addition, Walton argues in passing that the out-of-court statements were inadmissible hearsay pursuant to OCGA § 24-4-801.[7] We conclude

[7] Walton also concedes that this claim is subject to plain error review, as he failed to object to Robertson's testimony at trial. See *Grier v. State*, 313 Ga.

that Walton has not shown that either the alleged error in admitting Duckworth's statements under the Confrontation Clause or based on statutory hearsay grounds affected the outcome of his trial, as required under the third prong of the plain error standard. See *Castillo-Velasquez v. State*, 305 Ga. 644, 653 (2019) (citation and punctuation omitted).

The Confrontation Clause imposes an absolute bar to admitting out-of-court statements into evidence that are testimonial in nature when the defendant does not have an opportunity to cross-examine the declarant. See *McCord v. State*, 305 Ga. 318, 321 (2019). Robertson testified to Duckworth's statements to her after Johnson's shooting that Walton asked Duckworth to stop on a dirt road to use the restroom, an argument ensued between Walton and Johnson, and then Walton shot Johnson. Duckworth did not testify at trial and, thus, was not subject to cross-examination by Walton.

Assuming without deciding that Duckworth's statements to

236, 240 (2022) (unpreserved Confrontation Clause and hearsay objections reviewed for plain error only).

Robertson were testimonial and should have been excluded under the Confrontation Clause, the alleged erroneous admission of those statements "did not give rise to the reasonable probability that the outcome of the trial would have been different." *Grier v. State*, 313 Ga. 236, 245 (2022) (citation and punctuation omitted). Not only was the evidence against Walton strong in this case, but Duckworth's statements to Robertson were also cumulative of other, uncontested evidence. That evidence included Walton's admissions that described the circumstances surrounding Johnson's shooting in a similar manner to what was testified to by Robertson. Moreover, Agent Howard's testimony from the preliminary hearing, a transcript of which was admitted into evidence and not challenged on appeal, also described similar statements by Duckworth about the shooting. Because the evidence was strong and the contested out-of-court statements by Duckworth are cumulative of other admitted evidence, Walton's claim of plain error based on the Confrontation Clause fails. See *Grier*, 313 Ga. at 245 (no plain error in admitting testimony that violated the Confrontation Clause,

where the evidence of guilt was strong, and the improperly admitted hearsay was duplicative of other properly admitted evidence).

Likewise, Walton's claim of error in the admission of Duckworth's statements to Robertson based on hearsay also fails. Assuming without deciding that Duckworth's statements to Robertson constitute inadmissible hearsay under OCGA § 24-8-801(c), and should have clearly been excluded, those statements were cumulative of other evidence, as previously noted. And, again, the evidence against Walton was strong in this case. Given that, Walton has not shown that the alleged error affected his substantial rights, as required by the plain error standard's third prong. See *Allen v. State*, 310 Ga. 411, 416–17 (2020) (no plain error in admitting hearsay, because the contested statements were cumulative of other evidence, including the defendant's unchallenged admission to his cellmate that he participated in the crime, and the evidence against the defendant was strong); *Anglin v. State*, 302 Ga. 333, 336 (2017) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally

31

admissible evidence of the same fact is introduced.”).

6. Finally, Walton contends that his trial counsel rendered constitutionally ineffective assistance in several ways. To prevail on a claim of ineffective assistance of counsel, a defendant must show that his counsel’s performance was deficient and that the deficient performance prejudiced him. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To satisfy the deficiency prong of the *Strickland* test, a defendant must demonstrate that trial counsel “performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms.” *Butler v. State*, 313 Ga. 675, 683 (2022) (citation and punctuation omitted). See also *Strickland*, 466 U.S. at 687–88. To satisfy the prejudice prong of the *Strickland* test, a defendant must demonstrate “a reasonable probability that, but for counsel’s deficiency, the result of the trial would have been different.” *Burke v. State*, 320 Ga. 706, 708 (2025) (citation and punctuation omitted). See also *Strickland*, 466 U.S. at 694. The defendant’s burden under *Strickland*, “though not impossible to carry, is a heavy one.” *Hayes*

*v. State*, 320 Ga. 505, 514 (2024). And, if a defendant fails to make a sufficient showing on one prong of the *Strickland* test, we need not address the other prong. *Starks v. State*, 320 Ga. 300, 304 (2024) (citation and punctuation omitted).

(a) Walton first contends that his trial counsel provided ineffective assistance in not objecting under Rule 404(b) or moving for a mistrial in response to Mitchell's testimony that Walton went to prison, as discussed in Division 4. This claim fails, as Walton has not demonstrated that his trial counsel's performance was constitutionally deficient.

As we concluded in Division 4, Mitchell's fleeting, unresponsive testimony did not place Walton's character into evidence. Thus, any objection or motion for mistrial based on Rule 404(b) would have been meritless, and "the failure to make a meritless objection is not deficient performance." *Smith v. State*, 315 Ga. 357, 367 (2022). See also *Brown v. State*, 307 Ga. 24, 33 (2019) (trial counsel not deficient for not objecting to a passing, non-responsive reference to the defendant's being identified using a "jail database," as that

33

testimony was not improper character evidence). Accordingly, Walton's ineffective assistance claim fails.

(b) Walton next argues that his trial counsel provided ineffective assistance in not objecting to the State's allegedly leading questions during the State's direct examination of Agent Howard. In his brief on appeal, Walton discusses some testimony elicited from Agent Howard, mostly about the timeline of the investigation into Johnson's death, and certain evidence that was discovered. Then, without pointing to a single, specific question by the State that Walton finds objectionable, he argues: "Throughout this extensive direct examination of this key witness, trial counsel for the Appellant did not make any objections to any of the obviously leading questions asked by the State. This lack of objections, along with other errors by trial counsel [sic] constituted ineffective assistance of counsel."

Although Walton provides sufficient page citations and references to specific testimony in his brief to determine the portions of the State's direct examination that he finds objectionable, Walton

omits any substantive legal analysis or citation to authority explaining *which* questions by the State were objectionable, *why* trial counsel's lack of objections here constitute deficient performance, and *how* that prejudiced him. See *Byrd*, 321 Ga. at 225 ("[L]itigants must do more than just make an argument or cite authority, but must now ensure that argument, citation to authority, and citation to the record are all present to avoid having an enumeration deemed abandoned."). See also *Taylor v. State*, 315 Ga. 630, 650 (2023) (citation and punctuation omitted) ("It is not the function of this Court to cull the record for a party to find alleged errors or to form arguments on the appellant's behalf."). For these reasons, we determine that Walton has abandoned this claim under Supreme Court Rule 22 (1), and decline to consider it.

(c) With respect to his third ineffective assistance of counsel claim, Walton argues that his trial counsel provided ineffective assistance in not reviewing the State's transcript of his recorded statement for accuracy, as discussed in Division 3. And in his fourth claim of ineffective assistance, Walton argues that trial counsel

should have objected and moved for a mistrial when it became clear that the recording of his statement was improperly redacted; the recording should have omitted any mention of charges that he had pending in Valdosta but the word "Valdosta" was heard in the recording. For both claims, Walton cites to the portion of the trial record involving the bench conference about the State's transcript and the discussion concerning redactions to the transcript and recording to exclude mention of Walton's Valdosta criminal charges, as the trial court had granted Walton's pretrial motion to exclude that information. However, Walton only makes bare assertions about how his counsel was deficient and provides no meaningful argument as to how trial counsel performed deficiently or how Walton was prejudiced as a result. Walton also cites no authority to support these claims. Accordingly, Walton's cursory arguments are deemed abandoned. See Ga. Sup. Ct. R. 22(1). See also, e.g., *Guyton v. State*, 321 Ga. 57, 62 n.5 (2025) (deeming ineffective assistance claim based on trial counsel's not moving for a mistrial based on allegedly objectionable testimony abandoned, where the appellant

36

failed to argue claim beyond a bare assertion of ineffective assistance); *Sauder v. State*, 318 Ga. 791, 816 n.21 (2024) (not addressing several ineffective assistance claims, where the appellant made no specific arguments or cited any supporting authority).

(d) Although not enumerated, Walton asserts in passing that, taken together, "the cumulative, collective, and prejudicial effect of errors by trial counsel" deprived him of a fair trial. However, this claim fails. Not only has Walton not substantively argued this claim of cumulative prejudice, as already discussed, he has abandoned three of his four ineffective assistance claims. And, with respect to the remaining claim concerning trial counsel's not objecting to Mitchell's passing reference to Walton's incarceration, Walton did not show that trial counsel performed deficiently. As such, we need not assess cumulative prejudice under *Strickland*. See *Scott v. State*, 309 Ga. 764, 771 (2020) ("Assessing cumulative prejudice is necessary only when multiple errors have been shown.").

7. Finally, we have assumed without deciding three trial court

errors – permitting the admission of gang literature; allowing the use of a transcript of Walton's recorded interview without making findings of accuracy or instructing the jury on the same; and allowing Robertson to testify about Duckworth's out-of-court statements about Johnson's shooting. However, we concluded for each assumed error that Walton has not shown harm. Moreover, Walton makes no argument that we should conduct a cumulative-error review or how we should aggregate harm arising from these errors. See *State v. Lane*, 308 Ga. 10, 18 (2020) ("[A] defendant who wishes to take advantage of the [cumulative-error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors."). Given this, we discern no apparent cumulative error on this record that would require a new trial. See *Johnson*, 321 Ga. at 427 n.3; *Robbins v. State*, 320 Ga. 19, 28 n.3 (2024).

*Judgment affirmed. All the Justices concur.*